FILED ___ LODGED
___ RECEIVED ___ COPY

JAN 2 8 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Rune Kraft
 rk@kraft.legal
Kraft Legal | United States
108 West 13th Street
Wilmington, Delaware 19801
 302 408 1000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Rune Kraft,

            Plaintiff,

vs.

CRH plc, an Irish public limited company, CRH
Americas, Inc., a Delaware corporation, CRH
Americas Materials, Inc., a Delaware
corporation, CRH Americas Products, Inc., a
Delaware corporation, CRH America, Inc., a
Delaware corporation, Oldcastle SW Group,
Inc., a Colorado corporation, Richie Boucher,
Albert Manifold, Senan Murphy, Gillian L.
Platt, Johan Karlström, Shaun Kelly, Heather
Ann McSharry, Mary K. Rhinehart, Lucinda J.
Riches, Siobhán Talbot, David Dillon, Isabel
Foley, Keith A. Haas, Randy Lake, Scott W.
Parson, Phillip Raimer, Craig Hall, David M.
Toolan, Vulcan Materials Company, a New
Jersey corporation, CalMat Co., a Delaware
corporation, Douglas R. Vadnais; and DOES 1-
10, Inclusive,

            Defendants.

Case No.    **CV21-00154-PHX-SMB**

**COMPLAINT**

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE ⅬⱤϹⱳⱣЅⵏ_____
            (Rule Number/Section)

COMPLAINT                                                                    i

# TABLE OF CONTENTS

1.  Jurisdiction ..................................................................................................... 1
2.  Parties ............................................................................................................. 1
3.  Statement of Claim for Relief ...................................................................... 13
4.  Swearing in the Facts Under Penalty of Perjury......................................... 14
5.  Constitutional Standing. Article III of the U.S. Constitution ..................... 23
6.  Statutory Standing. 28 U.S.C. § 1343(a) and 18 U.S.C. § 1964(c) ........... 24
7.  Follow the Money – Money Laundering Is the Lifeblood of Organized Crime. However, of the Amount of Money that Is Being Laundered Through the Global Financial System Each Year, about $ 1.6 Trillion, Less Than One Percent of Global Illicit Financial Flows Are Currently Seized or Frozen. In the United States Alone, Total Criminal Proceeds Are Estimated At $300 Billion, With Only 0.4% Of Those Funds Being Subjected to Seizure. All This Money Has to Go Somewhere.................................................................................... 27
8.  Broadly Speaking, "Money Laundering Is A Financial Transaction with Property That Represents the Proceeds of Some Form of Unlawful Activity. The Transaction Is Done for The Purpose of Concealing the Criminal Source of These Proceeds by Disguising the Income to Appear Legitimate." ................... 28
9.  The Fair Notice Principle Undergirds Global Business, And the Lack of Enforcement of Money Laundering Violations Enables the Defendants Transnational Organized Crimes ............................................................... 29
    9.1   The World Runs on Fair Notice .......................................................... 29
    9.2   The Defendants Operate Companies Entrusted with Managing America's Natural Resources and Provide Products and Services for Vital Infrastructure Needs and Are Abusing the Global Financial System to Help in Covering Up Illicit Business Practices ......................... 31
    9.3   Further Aggravating Circumstances Are That About 50% of the Defendants' Revenues in the United States Are Derived from Doing Business with Local, State and Federal Government Entities, Which Were Prohibited from Entering into Contracts and Doing Business with Criminal Enterprises ............................................................... 32
10. Plaintiff is First Applying the Declaratory Judgment Act to the Criminal Source of the Defendants' Money Laundering, the Property That Represents the Proceeds of Specified Unlawful Activity. 28 U.S.C. §§ 2201-2202 ................ 33
    10.1  The Constitutional Limitations on Federal Jurisdiction Make Federal Courts "Courts of Limited Jurisdiction" .............................................. 37
    10.2  The Requirement That Jurisdiction Be Established as A Threshold Matter Is 'Inflexible and Without Exception' .................................... 38
    10.3  The Courts of the United States of America Have Been Used Without Jurisdiction, Which Means That Their Orders Are Not Voidable, But Void.................................................................................................. 38
11. The Defendants Use Their Considerable Financial Resources to Corruptly Grease the Wheels of Justice of the Courts of the United States of America ........... 45

11.1 The Defendants Use Both In-House and Outside Attorneys. However, They Are All Officers of the Court, and Cannot Advice, Assist and/or Further Criminal Activities and Fraudulent Schemes ............................... 45

11.2 Nevertheless, In-House Attorneys in Georgia, In Exchange for a Share of The Criminally Derived Property, Were Able to Lure Attorneys in California, Arizona, Colorado, and New Mexico to Support the Plan ............ 49

11.3 FRCP 11(b), the Rules of Professional Conduct for Attorneys in Georgia, California, Arizona, Colorado, and New Mexico and the Local Rules of the Federal District Courts in California, Arizona, Colorado, and New Mexico Prohibit Rendering Legal Services in Exchange for a Share of Criminally Derived Property ............................. 50

12. *United States* v. *Turkette,* 452 U. S. 576 (1981), 18 U.S.C. § 1961(4) ................. 50

13. *Salinas* v. *United States,* 522 U. S. 52 (1997), 18 U.S.C. § 1962(d) ....................... 52

14. *Sedima, S.P.R.L.* v. *Imrex Co.,* 473 U. S. 479 (1985), 18 U.S.C. §§ 1962, 1964(c).... 53

15. Plaintiff is Second Applying the Racketeer Influenced and Corrupt Organizations Act to the Defendants' Criminal Conduct. 18 U.S.C. §§ 1961-1968 ... 54

16. The Defendants Were Involved in Actual or Attempted Financial Transactions, Which the Defendants Then Knew Involved the Proceeds of Unlawful Activity, With the Intent to Promote the Specified Unlawful Activity of Bank Fraud. 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(c)(7)(A), 1957(a), 1344(1), 1344(2), 1961(1)......... 55

16.1 The Pre-Layering, the Conduct That Violated 18 U.S.C. § 1512(c) .............. 55

16.2 The Pre-Layering, the Conduct That Violated 18 U.S.C. § 1503(a) ............. 55

16.3 The Derived Property Is Criminally Derived Property.............................. 57

17. Conspiracy to Commit Mail Fraud, Wire Fraud and Obstruction of Justice............. 57

18. Mail Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1341) ................. 72

19. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343) ................. 80

20. Obstruction of Justice. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1512(c)).................................................................................. 85

21. Obstruction of Justice. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1503) ....................................................................................... 91

22. The Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956-1957 ............... 110

22.1 18 U.S.C. §§ 1956-1957.................................................. 110

22.2 Engaging in Monetary Transactions in Criminally Derived Property............. 113

22.3 The Defendants' Money Laundering Layering ........................................ 115

22.3.1 The CRH, plc Integration Layers ..................................... 117

22.3.2 The Vulcan Materials Company Integration Layers ........................... 117

22.4 Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a))............................................................................ 118

22.5 Monetary Transactions in Property Derived from Specified Unlawful Activity. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1957(a)) ........... 215

22.6 Washington ............................................................. 357

22.7 California ............................................................... 358

22.8 Texas ................................................................... 366

22.9 Colorado ............................................................... 367

COMPLAINT

iii

22.10 Utah ............................................................................................ 367
22.11 Arizona ....................................................................................... 370
22.12 New Mexico ................................................................................ 371
22.13 Alabama ...................................................................................... 373
22.14 Georgia ....................................................................................... 374
22.15 Ireland ........................................................................................ 376
23. Bank Fraud .............................................................................................. 377
   23.1 *Neder* v. *United States*, 527 U. S. 1 (1999) ................................... 377
   23.2 *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. 639 (2008) ................. 378
   23.3 *Shaw* v. *United States*, 580 U. S. ___ (2016), 18 U. S. C. §1344(1) .............. 379
   23.4 Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1)) ..... 381
   23.5 *Loughrin* v. *United States*, 573 U. S. 351 (2014), 18 U. S. C. §1344(2) ......... 478
   23.6 Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2)) .... 479
24. The Use of the Criminally Derived Property at CRH, plc .................................... 575
   24.1 The CRH, plc "Required Return" Acquisitions Due Diligence Process ........... 575
   24.2 The CRH, plc "Required Return" Board Proposal and Approval Process ......... 575
   24.3 The CRH, plc "Required Return" and "Incentives" Operations.................... 576
   24.4 The CRH, plc "Required Return" and "Incentives" Employment Contracts..... 576
   24.5 Acquisitions ................................................................................. 576
   24.6 Dividends .................................................................................... 576
   24.7 The Transfers from Washington To Georgia And Ireland Are Charged Under 18 U.S.C. § 1957. The CRH Defendants Had Control Over the Funds Received from The Fraudulent Claims and Then Transferred the Funds in Interstate or Foreign Commerce. *In re Brown*, 953 F.3d 617, 623 (9th Cir. 2020) and *United States v. Oriho*, No. 19-10291 (9th Cir. 2020) ............................................................................... 577
25. The Use of the Criminally Derived Property at Vulcan Materials Company ........... 578
26. The Court Has Jurisdiction Over the Foreign Persons Defendants. 18 U.S.C. § 1956(c)(3) ............................................................................................. 579
27. The Defendants' Have Accumulated Assets and Businesses That Affect the Interstate Commerce System and Divestitures are Appropriate. 18 U.S.C. § 1964(a) .................................................................................................. 579
28. Plaintiff Was Directly Harmed by the Defendants ........................................... 580
29. The Racketeering Activity Has Injured Plaintiff in His Business and Property ......... 580
   29.1 Financial Loss - Contractual Rights, Construction Products, Private ............. 580
   29.2 Financial Loss - Contractual Rights, Construction Materials, Private............... 581
   29.3 Financial Loss - Contractual Rights, Construction Materials, Government....... 581
   29.4 Financial Loss Based on Contractual Rights ........................................ 581
   29.5 Financial Loss Based on Proprietary Interest in Real Property ................... 581
   29.6 Financial Loss Based on Proprietary Interest in Information Technology Property ...................................................................................... 583
   29.7 Money Loss Based on Proprietary Rights ........................................... 583
   29.8 Loss of Property or Impairment to Property ........................................ 583
30. Relief Sought ......................................................................................... 584

## 1.  Jurisdiction

1. This case involves deprivation of rights, 42 U.S.C. § 1983, which gives this court authority pursuant to 28 U.S.C. § 1343(a) as to deprivation of civil rights and 28 U.S.C. § 1331 as to federal question or issue.

2. The court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

3. This is an action for civil relief under 18 U.S.C. §§ 1961 et seq., which gives this court authority pursuant to 18 U.S.C § 1964(a), and the district court has jurisdiction pursuant to 28 U.S.C. § 1331.

4. The court has the authority to grant civil relief under 18 U.S.C. § 1964(c).

5. This court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 since the parties hereto are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $ 75,000.

## 2.  Parties

6. Rune Kraft ("Kraft") is based outside the United States and manages and develops businesses and assets globally.

7. Defendant CRH, plc, an Irish public limited company, is based outside the United States and manages and develops businesses and assets globally. 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendant is responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH

COMPLAINT                                                                              1

Entities as contractors. CRH, plc has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

8. Defendant CRH Americas, Inc., a Delaware corporation; CRH Americas Materials, Inc., a Delaware corporation; CRH Americas Products, Inc., a Delaware corporation; CRH America, Inc., a Delaware corporation; and Oldcastle SW Group, Inc., a Colorado corporation are businesses of CRH, plc ("CRH Entities"). 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendants are responsible for the activities in the United States of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Their roles in the fraudulent schemes alleged herein are that they either ordered, participated in, or turned a blind eye to the unlawful activities and have allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. They have thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. These corporate entities have acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

9. Richie Boucher is a citizen of Ireland and is the Chairman of the Board of Directors of CRH, plc. He has been a member of the Board since March 2018. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he turned a blind eye to the unlawful activities and

COMPLAINT                                                                 2

has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Boucher has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

10. Albert Manifold is a citizen of Ireland and the Chief Executive of CRH, plc. He has been a member of its Board of Directors since January 2009. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Manifold has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

11. Senan Murphy is a citizen of Ireland and the Group Finance Director of CRH, plc. He has been a member of its Board of Directors since January 2016. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH

COMPLAINT                                                                                    3

Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Murphy has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

12. Gillian L. Platt is a citizen of Canada and the Senior Independent Director of CRH, plc. She has been a member of its Board of Directors since January 2017. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. Platt has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

13. Johan Karlström is a citizen of Sweden and a Non-executive Director of CRH, plc. He has been a member of its Board of Directors since September 2019. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and

COMPLAINT                                                                    4

fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Karlström has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

14. Shaun Kelly is a dual Irish and United States citizen and a Non-executive Director of CRH, plc. He has been a member of its Board of Directors since December 2019. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Kelly has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

15. Heather Ann McSharry is a citizen of Ireland and a Non-executive Director of CRH, plc. She has been a member of its Board of Directors since February 2012. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. McSharry has acted as in agreement

COMPLAINT                                                                                       5

with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

16. Mary K. Rhinehart is a citizen of the United States and a Non-executive Director of CRH, plc. She has been a member of its Board of Directors since October 2018. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. Rhinehart has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

17. Lucinda J. Riches is a citizen of Britain and a Non-executive Director of CRH, plc. She has been a member of its Board of Directors since March 2015. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. Riches has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful

COMPLAINT                                                                                     6

activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

18. Siobhán Talbot is a citizen of Ireland and a Non-executive Director of CRH, plc. She has been a member of its Board of Directors since December 2018. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. Talbot has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

19. David Dillon is President, Global Strategy & Business Development of CRH, plc. He has been with CRH since 1998. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Dillon has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts

taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

20. Isabel Foley is Group General Counsel of CRH, plc. She has been with CRH since 2020. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. Ms. Foley has known the details of this fraudulent scheme since at least April 2020, and there has been no change in the course of conduct by the CRH entities. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Ms. Foley has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

21. Keith A. Haas is President, Building Products of CRH, plc. He joined CRH in 1995. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Haas has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by

persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

22. Randy Lake is President, Americas Materials of CRH, plc. He joined CRH in 1996. CRH, plc's officers and directors are responsible for the global activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Lake has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

23. Scott W. Parson is the President of Staker & Parson Companies, a Utah corporation, based in Ogden, Utah. The company is owned by CRH. He is also part of the management of Oldcastle SW Group, Inc., based in Grand Junction, Colorado. Oldcastle SW Group, Inc.'s accounts payable was administered in Ogden, Utah by the staff of Staker & Parson Companies. The officers and directors of the CRH Entities are responsible for the local and regional activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Parson has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts

COMPLAINT                                                                                          9

taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

24. Phillip Raimer was the head of Oldcastle SW Group, Inc.'s finance department located in Grand Junction, Colorado. The officers and directors of the CRH Entities are responsible for the local and regional activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Raimer has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

25. Craig Hall was the in-house counsel for CRH in the United States. At this time, it is not known to Plaintiff if he is still employed by a CRH entity. He is a member of the State Bar of Georgia. The officers and directors of the CRH Entities are responsible for the local and regional activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Hall has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

COMPLAINT                                                                 10

26. David M. Toolan is the in-house counsel for CRH in the United States. He is a member of the State Bar of Georgia. The officers and directors of the CRH Entities are responsible for the local and regional activities of the CRH Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the CRH Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the CRH Entities or indirectly employed by the CRH Entities as contractors. Mr. Toolan has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the CRH Entities, members of the conspiracy, to further the crimes described herein.

27. Richie Boucher, Albert Manifold, Senan Murphy, Gillian L. Platt, Johan Karlström, Shaun Kelly, Heather Ann McSharry, Mary K. Rhinehart, Lucinda J. Riches, Siobhán Talbot, David Dillon, Isabel Foley, Keith A. Haas, Randy Lake, Scott W. Parson, Phillip Raimer, Craig Hall and David M. Toolan are referred to herein as the "CRH Managers", and collectively with the CRH Entities "CRH Parties" or "CRH Defendants".

28. Defendant Vulcan Materials Company, a New Jersey corporation, is based in Birmingham, Alabama and manages and develops businesses and assets in the United States. 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendant is responsible for the activities in the United States of the Vulcan Materials Company, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of Vulcan Materials Company and/or its subsidiaries to support the fraudulent

scheme. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes. Vulcan Materials Company has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by members of the conspiracy to further the crimes described herein.

29. Defendant CalMat Co., a Delaware corporation, is a business of Vulcan Materials Company (collectively with Vulcan Materials Company "Vulcan Entities"). 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. Predominantly, the Defendant is responsible for the activities in the Southwest and West Coast of the United States of the Vulcan Materials Company, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of CalMat Co. to support the fraudulent scheme. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes. CalMat Co. has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by members of the conspiracy to further the crimes described herein.

30. Douglas R. Vadnais is managing the legal affairs of the Vulcan Entities in New Mexico ("Vulcan Manager"). He is a member of the State Bar of New Mexico. He is responsible for the local and regional legal matters of the Vulcan Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, always. His role in the fraudulent schemes alleged herein is that he participated in the unlawful activities and has allowed the continued use of the resources of the Vulcan Entities to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes. Mr. Vadnais has acted as in agreement with at least one other person who committed the predicate

COMPLAINT                                                                                     12

acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by members of the conspiracy to further the crimes described herein.

31. The Vulcan Entities are collectively with the Vulcan Manager referred to herein as the "Vulcan Parties" or "Vulcan Defendants".

### 3.   Statement of Claim for Relief.

32. This is an action for deprivation of rights under 42 U.S.C. §§ 1981 *et seq.*, which gives this court authority pursuant to 28 U.S.C. § 1343 (a), and civil relief under 18 U.S.C. §§ 1961 *et seq.*, which gives this court authority pursuant to 18 U.S.C § 1964 (a), and the district court has jurisdiction pursuant to 28 U.S.C. § 1331. FRCP 8(a)(1)

33. At the United States District Court for the District of Central California Case No. CV10-1776 VBF-OP, and its derivative case, Case No. 2:15-cv-00701-VBF-AS, have been corruptly adjudicated. Plaintiff has a right to require that the courts of the United States and their government officials act within the judicial power of the United States. Pursuant to *Hagans v. Lavine*, 415 U.S. 528, 538 (1974) any use of federal courts without merit causes the federal courts to lack subject-matter jurisdiction. Subject-matter jurisdiction is an Article III as well as a statutory requirement and functions as a restriction on federal power and contributes to the characterization of the federal sovereign. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982). Plaintiff has a legal entitlement to business relations and property rights unhampered by schemes prohibited by the RICO predicate statutes. 18 U.S.C. §§ 1962(c), 1961(1); See *Dumas v. Major League Baseball Prop.*, 104 F.Supp.2d 1220, 1222 (S.D. Cal. 2000), aff'd sub nom. Also see *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, (9th Cir. 2002). FRCP 8(a)(2)

34. Plaintiff seeks to have the district court order: (1) that Case No. CV10-1776 VBF-OP is not within the judicial power of the United States making the Orders of Case No. CV10-1776 VBF-OP, and derivatively, Case No. 2:15-cv-00701-VBF-AS void; (2) that any public records related in any manner to the corrupt adjudication of Case No. CV10-1776 VBF-OP and Case No. 2:15-cv-00701-VBF-AS be removed; (3) that any transactions, including derivative transactions

COMPLAINT                                                                                    13

that has injured Plaintiff in his business and property are invalidated based on the district court's authority pursuant to 18 U.S.C. § 1964 (a); and (4) that the Plaintiff shall recover threefold the damages he has sustained and the cost of the suit based on the district court's authority under 18 U.S.C. § 1964 (c). FRCP 8(a)(3)

## 4. Swearing in the Facts Under Penalty of Perjury.

I, Rune Kraft, based on personal knowledge, declare:

### BACKGROUND

The basics of how American companies do business are that they hire employees and contractors to create value, i.e., to make sure customers are satisfied; to find the next big product; to create the best service etc.

The direct beneficiary of the work performed by the employees and contractors is the company. The company gets more revenues, more profits, more assets, and more retained earnings. With excellent performance by the employees and contractors the company becomes more valuable.

When the company becomes more valuable, the owners of the company will be able to take this higher value, divide it by the interest they have in the company, and see an increase in the value of their ownership stake.

Therefore, almost universally throughout America, companies hire employees and contractors to do work for companies, and the benefits from the work go to the companies.

**In this matter it was portrayed that a contractor doing work for the company could not be paid by the company because a transaction took place causing the shares to be sold from one owner to another owner and since the old owner would not benefit from this work the contractor should not be paid by the company.**

The value of the work created by the contractor was distributed to the company. Employees and contractors to companies have no control over the price the owners of the companies decide to sell or buy their interests in the company for.

COMPLAINT

14

Contractors also have no control over the disclosures that the companies elect to make to their shareholders about the work of their employees or contractors or the value of such work.

From January 20, 1969 until December 31, 2006 all of the efforts of every employee and contractor Inland Concrete Enterprises, Inc. ("Inland, Inc.") had ever hired had created a series of exact balances: a balance sheet derived from the period since the company was started with a series of assets, liabilities and equity lines; an income statement derived from the last 12 months of activities with a series of revenues, gains, costs and charges; and a cash flow statement derived from the last 12 months of activities with a series of activities causing cash to come in and go out. From January 20, 1969 until December 31, 2006 all of the efforts of every employee and contractor Inland, Inc. had ever hired had also created an opinion of the Fair Market Value of the common stock of Inland, Inc. This number, assessed as a controlling interest and going concern basis was approximately $20,690,000, or $180.00 per share based on 114,687 total common shares outstanding.

**Rune Kraft ("Kraft") runs a large number of companies across sectors of the economy, globally, and commits people, capital and ideas to grow.**

**Kraft committed people, capital and ideas to grow Inland, Inc.**

**The work that Kraft performed for Inland, Inc. was research and analysis about construction materials markets, products and companies tailored to its skill set, assets, resources and markets, areas that Kraft has extensive and deep expertise about.**

**Reiterating, Kraft performed work for Inland Concrete Enterprises, Inc.**

Inland, Inc. used this work to present: how the historic performance of the company could have been; how the present condition of the company could have been; and how the future performance of the company could be.

The work that Kraft performed for Inland, Inc. **caused benefits to Inland, Inc.** Based on the work the series of how the balances for Inland, Inc. could have been (the past, present and future balance sheets: the past, present and future income statements; the past, present and future cash flow statements) made Inland, Inc. a company with better history, present and future.

Specifically, the company was able to show higher past, present and future profits. This perceived value could become reality for Inland, Inc. and provided a roadmap for what, when,

COMPLAINT

15

where and how the efforts of Inland, Inc. should be to produce higher profits. The higher profits **made Inland, Inc. more valuable**.

The benefit from the contractor's work was derived by Inland, Inc. **The work was unrelated to the ownership of the common stock of Inland, Inc.**

**Any owners or prospective owners of the common stock of Inland, Inc. could study the work, if made available by Inland, Inc., and make their own opinion of the fair market value of the common stock of Inland, Inc. and the price that would cause them to sell or buy the common stock of Inland, Inc.**

The work increased the value of Inland, Inc. from $ 21 million to more than $ 60 million [1].

Related to this work, a statement was issued to Inland, Inc. in the amount of $ 5 million.

## THE $ 5 MILLION STATEMENT, INCLUDING THE INTEREST THAT HAS ACCRUED, IS THE LIABILITY OF THE CRH ENTITIES

---

[1] Companies can be valued in many different ways. Most common is to look at the annual earnings and then use a multiple of these earnings as the valuation. Publicly traded companies (companies listed on the NYSE or NASDAQ stock exchanges) are traded on this basis, or on a P/E multiple basis. With this method, the higher the historic earnings, the higher the valuation and the more optimistic the markets are about the future of the company, the industry and the economy in general, the higher the multiple. Another method is asset based, valuing a business' buildings, machines, products, raw materials and any intangibles like brand, sum it up and here comes the value. Still another method is cash flow based, forecasting future expected revenues and costs, arrive at an expected net profit, run the forecast for a period of time (usually five to ten years), then calculate the terminal value (future cash flows extended into perpetuity), and apply a discount rate which reflects the time value of money and riskiness of the business to bring the cash flow to its present value.

Kraft uses these methods, other methods, and a combination of methods.

Kraft's work showed what could be done with Inland, Inc.'s assets to realize better value, what investments could be made to generate more profits and how the company could better run its business.

These methods showed that Inland, Inc. at the end of 2007 could be valued at more than $ 60 million.

COMPLAINT                                                                                          16

Following the acquisition of 100% of the outstanding shares of Inland, Inc., the CRH Managers caused Inland, Inc. to be merged with Oldcastle Precast, Inc. and for Oldcastle Precast, Inc. to change its name to Oldcastle Infrastructure, Inc.

All the while without causing the statement that had been issued to Inland, Inc. to be paid.

## THE LACK OF STANDING

In Case No. CV10-1776 VBF-OP the Inland Concrete Enterprises, Inc. Employee Stock Ownership Plan "Inland ESOP") fraudulently induced jurisdiction by claiming that it had suffered $ 3 million in damages in the transaction it completed with Oldcastle Precast, Inc. by reason of having hired Rune Kraft and Kraft Americas, L.P. to render brokerage services concealing that the Inland ESOP had not only suffered no damages but had gained $ 3 million.

| Inland Parties' representations to the court | The true transaction documents [2] |
| --- | --- |
| The Inland ESOP was shortchanged | The Inland ESOP received "too good a deal" |
| The Inland ESOP was deprived of $ 3 million | The Inland ESOP was given $ 3 million |
| The buyer was really willing to pay $ 3 million more to the Inland ESOP | The buyer was not only unwilling to pay $ 3 more but wanted to pay $ 3 million less |
| The Inland ESOP had entered into a broker contract with Kraft Americas, L.P. | The Inland ESOP had not entered into a broker contract with Kraft Americas, L.P. |
| Kraft Americas, L.P. was named as the broker in the transaction | Rune Kraft was named as the broker in the transaction. |
| The Inland ESOP had established a broker relationship | Rune Kraft was never hired to be the broker Rune Kraft had not consented to be the broker |

---

[2] The true transaction documents, encompassing thousands of pages, were withheld from the court and Kraft. Kraft learnt about these documents on July 21, 2013 when he reviewed discovery submitted by Oldcastle in another case (Case No. 2:12-cv-03681-JAK-E). The documents are the subject of a protective order in that legal proceeding. The CRH Entities have all of these documents and are parties in the transaction, which enable them to both investigate the documents and present the documents and related financial transactions to this court, if they wish to controvert.

COMPLAINT

17

There was also no broker contract between the Inland ESOP and Rune Kraft and Kraft Americas, L.P. because: (a) the three elements for a contract to be valid (an offer; acceptance of that offer; and consideration) were missing; (b) as California law required a broker contract to be in writing [3] and (c) as no written contract exists and has never existed.

## THE FRAUD UPON THE COURT

In Case No. CV10-1776 VBF-OP on November 15, 2010, the Inland Parties' attorneys received six electronic documents from Kraft. The electronic documents were delivered personally by Kraft to Cesar M. Ibanez, an assistant to the Inland Parties' attorneys, on a CD at 11755 Wilshire Blvd., 10th Floor, Los Angeles, CA 90025 at about 2:00 PM. The six electronic files showed the true times that Kraft had: created, modified, accessed and printed the six electronic documents and that Kraft had: created, modified, accessed and printed the six electronic documents contemporaneously, as he actually performed the tasks. This CD was ordered by the Inland Parties' attorneys as part of discovery in the legal proceeding at the court and Kraft swore under penalty of perjury that the facts contained on the CD were true.

On January 31, 2011, the Inland Parties' attorneys presented evidence they fabricated to get the court to proclaim that Kraft should neither be allowed to conduct discovery nor defend himself, and all his court filings should be stricken. And the court did exactly that.

The six electronic files the Inland Parties' attorneys received from Rune Kraft as part of discovery in Case No. CV10-1776 VBF-OP did not contain the anomalies portrayed in court filings.

RE: "Inland Fee Agreement – May 13, 2007 – Draft.doc"

These are the true facts:

Created: Thursday, May 17, 2007 9:16:00 AM
Modified: Thursday, May 17, 2007 9:54:02 AM
Accessed: Thursday, May 17, 2007 9:54:02 AM

---

[3] California law requires a broker contract to be in writing and signed by the parties. See California Business and Professions Code Sections 10176 (a) and (d), California Civil Code Sections 1624, 2079.13 et seq., 2295 et seq., among others. Also see *Phillippe v. Shapell Industries* (1987) 43 Cal. 3d 1247,1255-1258).

COMPLAINT                                                                                         18

Printed: Thursday, May 17, 2007 9:53:00 AM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

Created: Thursday, May 17, 2007 9:16:00 AM
Modified: Thursday, May 17, 2007 5:54:02 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, May 17, 2007 9:53:00 AM

The following specific facts were falsified:

Created: Thursday, May 17, 2007 9:16:00 AM
Modified: Thursday, May 17, 2007 5:54:02 AM          Four hours earlier*
Accessed: Thursday, October 28, 2010 3:16:48 AM      Year, date and time*
Printed: Thursday, May 17, 2007 9:53:00 AM

* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.5 years after it was last "Modified" and "Printed" by Rune Kraft.

RE: "Inland Fee Agreement - May 13, 2007.doc"

These are the true facts:

Created: Thursday, May 31, 2007 2:03:00 PM
Modified: Thursday, May 31, 2007 2:25:52 PM
Accessed: Thursday, May 31, 2007 2:25:52 PM
Printed: Thursday, May 31, 2007 2:25:00 PM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

Created: Thursday, May 31, 2007 2:03:00 PM
Modified: Thursday, May 31, 2007 10:25:52 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, May 31, 2007 2:25:00 PM

The following specific facts were falsified:

Created: Thursday, May 31, 2007 2:03:00 PM
Modified: Thursday, May 31, 2007 10:25:52 AM        Four hours earlier*
Accessed: Thursday, October 28, 2010 3:16:48 AM     Year, date and time*
Printed: Thursday, May 31, 2007 2:25:00 PM

COMPLAINT

19

\* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.5 years after it was last "Modified" and "Printed" by Rune Kraft.

RE: "Letter to Inland – August 2, 2007.doc"

These are the true facts:

Created: Thursday, August 02, 2007 10:25:00 AM
Modified: Thursday, August 02, 2007 10:38:00 AM
Accessed: Thursday, August 02, 2007 10:38:00 AM
Printed: Thursday, August 02, 2007 10:37:00 AM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

Created: Thursday, August 02, 2007 10:25:00 AM
Modified: Thursday, August 02, 2007 6:38:00 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, August 02, 2007 10:37:00 AM

The following specific facts were falsified:

Created: Thursday, August 02, 2007 10:25:00 AM
Modified: Thursday, August 02, 2007 6:38:00 AM          Four hours earlier\*
Accessed: Thursday, October 28, 2010 3:16:48 AM          Year, date and time\*
Printed: Thursday, August 02, 2007 10:37:00 AM

\* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.2 years after it was last "Modified" and "Printed" by Rune Kraft.

RE: "Letter to Inland – May 17, 2007.doc"

These are the true facts:

Created: Thursday, May 17, 2007 10:03:00 AM
Modified: Thursday, May 17, 2007 10:15:30 AM
Accessed: Thursday, May 17, 2007 10:15:30 AM
Printed: Thursday, May 17, 2007 10:13:00 AM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

COMPLAINT

20

Created: Thursday, May 17, 2007 10:03:00 AM
Modified: Thursday, May 17, 2007 6:15:30 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, May 17, 2007 10:13:00 AM

The following specific facts were falsified:

Created: Thursday, May 17, 2007 10:03:00 AM
Modified: Thursday, May 17, 2007 6:15:30 AM          Four hours earlier*
Accessed: Thursday, October 28, 2010 3:16:48 AM      Year, date and time*
Printed: Thursday, May 17, 2007 10:13:00 AM

* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.5 years after it was last "Modified" and "Printed" by Rune Kraft.

RE: "Letter to Inland – May 31, 2007.doc"

These are the true facts:

Created: Thursday, May 31, 2007 3:13:00 PM
Modified: Thursday, May 31, 2007 3:32:56 PM
Accessed: Thursday, May 31, 2007 3:32:56 PM
Printed: Thursday, May 31, 2007 3:32:00 PM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

Created: Thursday, May 31, 2007 3:13:00 PM
Modified: Thursday, May 31, 2007 11:32:56 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, May 31, 2007 3:32:00 PM
The following specific facts were falsified:

Created: Thursday, May 31, 2007 3:13:00 PM
Modified: Thursday, May 31, 2007 11:32:56 AM          Four hours earlier*
Accessed: Thursday, October 28, 2010 3:16:48 AM       Year, date and time*
Printed: Thursday, May 31, 2007 3:32:00 PM

* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.5 years after it was last "Modified" and "Printed" by Rune Kraft.

COMPLAINT                                                                 21

RE: "Inland Fee Agreement – July 31, 2007.doc"

These are the true facts:

Created: Thursday, July 25, 2002 8:32:00 AM
Modified: Thursday, August 2, 2007 10:12:58 AM
Accessed: Thursday, August 2, 2007 10:12:58 AM
Printed: Thursday, August 2, 2007 10:12:00 AM

Court filings were made that incorrectly portrayed the print-out of "statistics" for this electronic document as follows:

Created: Thursday, July 25, 2002 8:32:00 AM
Modified: Thursday, August 2, 2007 6:12:58 AM
Accessed: Thursday, October 28, 2010 3:16:48 AM
Printed: Thursday, August 2, 2007 10:12:00 AM

The following specific facts were falsified:

Created: Thursday, July 25, 2002 8:32:00 AM
Modified: Thursday, August 2, 2007 6:12:58 AM        Four hours earlier*
Accessed: Thursday, October 28, 2010 3:16:48 AM      Year, date and time*
Printed: Thursday, August 2, 2007 10:12:00 AM

* The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.2 years after it was last "Modified" and "Printed" by Rune Kraft.

Case No. 2:15-cv-00701-VBF-AS was the first time Kraft brought claims against the named defendants and the first time the named defendants were confronted with claims of running an "enterprise", 18 U.S.C. § 1961(4), based on the private right of action of 18 U.S.C. § 1964.

The CRH Managers have used the CRH Entities to unrelentingly slander Kraft based on false, fraudulent and slanderous portrayals, including Kraft having served as a broker, having caused damages serving in that role, fabricating evidence and being a vexatious litigant ("Fraudulent Scheme").

The CRH Managers using the CRH Entities have tried to cause injuries to Kraft's business and property, including trying to steal a contract Kraft has with whoever the operator is at 518 E.

COMPLAINT

22

Frontage Road, Algodones, NM 87002, which is a site used for mining, manufacturing, distribution, and sales of construction materials. As a result, that contract is in breach.

Kraft has a contract with the United States of America and the State of California, which covers recovery of damages for the sale of construction materials. The enforcement of this contract has been impeded because of the CRH Entities Fraudulent Scheme.

I am competent to testify to the facts set forth in this declaration and declare under the penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct.

DATED this 27th day of January 2021.



_____

Rune Kraft

## 5.  Constitutional Standing. Article III of the U.S. Constitution.

35. A party seeking to use this district court must present an "actual controversy" in order to satisfy the "case or controversy" requirement of Article III.

36. The Defendants are injuring Plaintiff's in his business and property, as detailed in Section 5 herein. The unlawful conduct described herein is also causing damages to Plaintiff's person by impairing his personal time and smearing his good name.

37. The Plaintiff presents an "actual controversy" and thus satisfies the controversy requirement of Article III.

38. Like any other federal court plaintiff, he must also satisfy the three requirements for constitutional standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

COMPLAINT

23

39. The law of standing has its roots in Article III's case and controversy requirement. *Summers v. Earth Island Institute*, 555 U.S. 488, 492-93 (2009); *DaimlerChrysler Corporation v. Cuno*, 547 U.S. 332, 340-41 (2006).

40. The U.S. Supreme Court has established a three-part test for standing. The "irreducible constitutional minimum of standing" requires the plaintiff to establish:

> First ... an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

> *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); see also *Summers*, 555 U.S. at 493.

41. The party invoking federal jurisdiction bears the burden of establishing these elements. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

42. As detailed herein, this is a controversy pursuant to Article III of the United States Constitution § 2, cl.1. Kraft has constitutional standing to defeat and end this fraudulent scheme. This complaint details: injury in fact, the first element of *Lujan* at 560-61; that the injury in fact is fairly traceable to the defendants' challenged actions, the second element of *Lujan* at 560-61; and that "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision", the third element of *Lujan* at 560-61.

## 6. Statutory Standing. 28 U.S.C. § 1343(a) and 18 U.S.C. § 1964(c).

43. Plaintiff is applying 42 U.S.C. § 1983 to the facts. This statute provides Plaintiff the authority to bring an action at law, suit in equity, or other proper proceeding for redressing deprivation of any rights secured by the Constitution and laws of the United States.

> To state a claim under 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535

COMPLAINT

24

(1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330 -331 (1986)); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

*West v. Atkins*, 487 U.S. 42 (1988) at II

44. Plaintiff fulfills the first requirement by alleging a violation of his rights secured by his constitutional Equal Protection rights pursuant to the Due Process Clause of the Fifth Amendment and the Fourteenth Amendment as it relates to Civil Rights. 42 U.S. Code Chapter 21. 42 U.S.C. §§ 1981 et seq.

45. The second essential element is met as the alleged violator is the United States of America tasked with ensuring that constitutional rights are protected, the records of its courts are true and correct, and that its courts operate in a safe and sound manner and comply with applicable laws and regulations. The courts of the United States are run by government officials and government employees. Plaintiff is subjected to conduct under color of law, and this conduct deprived him of rights guaranteed under the U.S. Constitution and federal law. Misuse of power, possessed by virtue of law and made possible only because the wrongdoer is clothed with the authority of law, is action taken 'under color of' law. *United States v. Classic,* 313 U.S. 299, 61 S. Ct. 1031, 85 L. Ed. 1368 [1941]; Accord, *Monroe v. Pape*, 365 U.S. 167, 187 (1961) (adopting Classic standard for purposes of 1983) (overruled in part on other grounds, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 695 -701 (1978)); *Polk County v. Dodson*, 454 U.S. 312, 317 -318 (1981); id., at 329 (dissenting opinion); *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676; *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U.S. 278, 287, et seq., 33 S.Ct. 312, 314, 57 L.Ed. 510; *Hague v. C.I.O.*, 307 U.S. 496, 507, 519, 59 S.Ct. 954, 960, 965, 83 L.Ed. 1423; cf. Id., 3 Cir., 101 F.2d 774, 790. In *Lugar v. Edmondson Oil Co.*, supra, the Court made clear that if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, "that conduct [is] also action under color of state law and will support a suit under 1983." Id., at 935. Accord, *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982); *United States v. Price*, 383 U.S., at 794 , n. 7. In such circumstances, the defendant's alleged infringement of the plaintiff's federal rights is "fairly attributable to the State." *Lugar*, 457 U.S., at 937.

COMPLAINT

25

46. To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Ibid. "[S]tate employment is generally sufficient to render the defendant a state actor." Id., at 936, n. 18; see id., at 937. It is firmly [487 U.S. 42, 50] established that a defendant in a 1983 suit acts under color of state law when he abuses the position given to him by the State. See *Monroe v. Pape*, 365 U.S., at 172. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. See, e. g., *Parratt v. Taylor*, 451 U.S., at 535 -536; *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). See also *Flagg Bros., Inc. v. Brooks*, 436 U.S., at 157, n. 5.

47. Plaintiff's rights were deprived, constitutional rights and federal statutory rights. As to 42 U.S.C. §§ 1981 et seq., the law was designed and clearly intended to benefit Plaintiff and similarly situated persons, resulting in the creation of federal rights that can be protected by section 1983. *Maine v. Thiboutot,* 448 U.S. 1, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980).

48. The two essential elements have been established.

49. Plaintiff has statutory standing to defeat and end this fraudulent scheme.

50. The alleged violations were a proximate or legal cause of the damages that the plaintiff suffered. *Arnold v. IBM Corp.*, 637 F.2d 1350 (9th Cir. 1981)

51. Courts also have broad power to grant equitable relief to plaintiffs in section 1983 actions. *United States v. City of Yonkers,* 96 F. 3d 600 (2nd Cir. 1996); *Wyatt v. Stickney,* 344 F. Supp. 373 (M.D. Ala. 1972); *Hutto v. Finney,* 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978). When the court does provide equitable relief, it usually also provides ongoing evaluation and supervision of the enforcement of its orders.

52. Under RICO, "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court" for civil damages. 18 U.S.C. § 1964(c). This statute is quite similar to the antitrust statute granting standing to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a), and consequently the two have been interpreted

in tandem. *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

53. To have a property interest protected by the Fourteenth Amendment, Plaintiff must have "more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). An entitlement of that magnitude arises when "statutes[,] regulations [or a contract] ... establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." *Id.* (quoting *Fincher v. South Bend Heritage Found.*, 606 F.3d 331, 334 (7th Cir.2010)). See *Santana v. Cook County Bd. of Review*, 679 F.3d 614, 623 (7th Cir. 2012).

54. Plaintiff claims a property interest protected by the Fourteenth Amendment based on contracts and ownership of physical assets. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir.2010), *cert. denied,* —— U.S. ——, 132 S.Ct. 754, 181 L.Ed.2d 481 (2011).

**7. Follow the Money – Money Laundering Is the Lifeblood of Organized Crime. However, of the Amount of Money that Is Being Laundered Through the Global Financial System Each Year, about $ 1.6 Trillion, Less Than One Percent of Global Illicit Financial Flows Are Currently Seized or Frozen. In the United States Alone, Total Criminal Proceeds Are Estimated At $300 Billion, With Only 0.4% Of Those Funds Being Subjected to Seizure. All This Money Has to Go Somewhere.**

55. According to a 2011 estimate by the United Nations Office on Drugs and Crime ("UNODC"), the amount of money that has been laundered through the global financial system is between two percent to five percent of global Gross Domestic Product, or approximately $1.6 trillion.[4] Of this figure, UNODC believes that less than one percent of global illicit financial flows

---

[4] U.N. Office on Drugs and Crime, Estimating Illicit Financial Flows Resulting from Drug Trafficking and Other Transnational Organized Crimes: Research Report at 7 (Oct. 2011), http://www.unodc.org/documents/dataandanalysis/Studies/Illicit_financial_flows_2011_web.pdf

COMPLAINT

27

are currently seized or frozen. [5] In the United States alone, total criminal proceeds are estimated at $300 billion, with only 0.4% of those funds having been the subject to seizure. [6] All of this money has to go somewhere. While crimes of violence and drugs may seem to be the most immediate problems in many communities, it is money laundering that is "the life blood of organized crime." [7]

**8. Broadly Speaking, "Money Laundering Is A Financial Transaction with Property That Represents the Proceeds of Some Form of Unlawful Activity. The Transaction Is Done for The Purpose of Concealing the Criminal Source of These Proceeds by Disguising the Income to Appear Legitimate."**

56. Broadly speaking, "money laundering is a financial transaction with property that represents the proceeds of some form of unlawful activity. The transaction is done for the purpose of concealing the criminal source of these proceeds by disguising the income to appear legitimate." [8] While the methods for laundering money are continually evolving in order to evade detection by law enforcement, it is generally a three-step process: placement, wherein the criminal proceeds are placed into a legitimate enterprise; layering, wherein the funds are layered through a series of transactions to obscure the original source; and integration, wherein the laundered funds are integrated into the legitimate financial world in the form of various financial instruments. [9]

57. Although money laundering is often associated with organized crime like the Mafia and drug traffickers, [10] it has also been used by Fortune 500 companies to help in covering up illicit business practices. [11] Indeed, the President's Commission on Organized Crime ("the Commission") specifically points to three cases in which Gulf Oil, Lockheed Martin, and

---

[5] *Id.*

[6] *Id.* at 35.

[7] President's Commission on Organized Crime, Interim Report to the President and Attorney General, The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering, https://www.ncjrs.gov/pdffiles1/Digitization/166517NCJRS.pdf

[8] *See generally* Carolyn L. Hart, *Money Laundering*, 51 AM. CRIM. L. REV. 1449 (2014).

[9] *Id.* at 1450.

[10] *Supra* footnote 7.

[11] *Id.*

COMPLAINT

28

McDonnell Douglas all engaged in some form of money laundering for the purpose of concealing bribes to foreign officials.[12] Money laundering is not merely a tool of drug kingpins or mafia dons, it is utilized by any criminal actor seeking to bring dirty money into the financial system.[13]

### 9. The Fair Notice Principle Undergirds Global Business, And the Lack of Enforcement of Money Laundering Violations Enables the Defendants Transnational Organized Crimes.

#### 9.1   The World Runs on Fair Notice.

58. The world runs on fair notice.

59. This naturally follows as the rule of law and economic prosperity are indivisible and rule of law is the foundation for encouraging investment, whether internal or external, and for achieving wealth and prosperity. To any country or jurisdiction that wants sustained prosperity, abide by the rule of law. Only where disputes are settled according to well understood and regulated principles of law and settled free of corrupt or totalitarian influence will investment flow and individual and corporate prosperity follow. There is therefore a necessary and inevitable linkage between the rule of law and economic prosperity.

60. In all countries or jurisdictions where men and women of talent are free to exercise their skills in the knowledge that wrongs against them or their property will be prevented and punished by free courts, business needs may be promoted, protected and rewarded by a democratic or elected governments and prosperity will flourish. Where there is lawlessness and corruption the converse is the case. This simple principle has worked since the inception of mankind and has never been proven wrong.

61. "From the inception of Western culture, fair notice has been recognized as an essential element of the rule of law." [14]

---

[12] *Id.* at 12.
[13] *Id.* at 10. (The magnitude of the money laundering problem is also evidenced by the variety of schemes and the diversity of participants . . .)
[14] Note, *Textualism as Fair Notice*, 123 Harvard Law Review 542, 543 (2009).

COMPLAINT

29

62. Where fair notice is not given, there is an immediate question of whether the constitutional right to due process has been respected. [15] "Under the Constitution, the adoption of new laws restricting liberty is supposed to be a hard business, the product of an open and public debate among a large and diverse number of elected representatives." [16]

63. The constitutional requirement that parties be given fair notice is deeply rooted in America's legal system and applies to anybody—criminal or civil. The Supreme Court has applied this rule consistently and made clear that the rule applies broadly. *See FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317–18 (2012). *Also see Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012). The Supreme Court's holding in these two cases, which was based on the doctrine that parties must receive "fair notice" [17], is supported by nearly a century of established due process jurisprudence. [18] The fair notice requirement is an essential protection of the due process clause.

64. In *Fox* and *Christopher* the Court specified that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," [19] thus reaffirming the constitutional mandate "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." [20]

65. Therefore, America's court system is based on the Fair Notice Principle.

66. Related to this matter, the question therefore rises if the legislature of the United States prepared ambiguous statutory frameworks related to the pertinent issues of law.

---

[15] See generally *Sessions v. Dimaya*, 138 S. Ct. 1204, 1225 (2018) ("Perhaps the most basic of due process's customary protection is the demand of fair notice.")

[16] *Id.* at 1228.

[17] *Fox*, 132 S. Ct. at 2317 ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.") (citation omitted). *See also, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . [Moreover,] vague law[s] impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis . . . .").

[18] *See Fox*, 132 S. Ct. at 2317.

[19] Id.

[20] *Grayned*, 408 U.S. at 108.

COMPLAINT

30

67. The rules and statutes that apply to this matter provide the public with text that is unambiguous. The rules and statutes comply with the fundamental principle in our legal system that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required, and the clarity is essential to the protections provided by the Due Process Clause of the Fifth Amendment, as Justice Kennedy pointed out when he wrote *Fox*.

68. The rules and statutes are not impermissibly vague.

69. The rules and statutes do not fail to provide a person of ordinary intelligence fair notice of the procedures to follow.

70. The rules and statutes are not so standard less that the rules authorize or encourage seriously discriminatory enforcement.

71. However, the lack of enforcement of money laundering violations, as shown in Section 7 herein, enables the Defendants transnational organized crimes.

## 9.2 The Defendants Operate Companies Entrusted with Managing America's Natural Resources and Provide Products and Services for Vital Infrastructure Needs and Are Abusing the Global Financial System to Help in Covering Up Illicit Business Practices.

72. Aggregate is manufactured from mineral resources belonging to each community that have taken thousands of years to develop. Almost every item of infrastructure around us contains stone construction materials. It can either be as sand, which is stone crushed by nature, or stone crushed by machines, known as hard-rock aggregates (or crushed stone). Sand, gravel, and hard-rock aggregates are used as stone construction materials, which after modification are used to build roads, railway lines, buildings etc.

73. Geological materials with different grain sizes, such as sand, gravel, clay, and crushed rock (hard-rock aggregates) have been exploited by humans for thousands of years. These materials are considered non-renewable, although recycling has recently become more common. In some countries, there has been a recent shift towards using gradually more hard-rock aggregates in the materials mix, instead of sand and gravel.

COMPLAINT                                                                                      31

74. Aggregate, the raw material that the Defendants use to make the products they sell, touches everybody's life, and impacts everybody's finances. Everybody - lives in houses; obtain education at schools, drives on roads; works at offices, factories, or farms; receives water, sewer, electricity, and telephone services; gets goods and services at stores; recreates at parks and sports facilities; and worships at churches - built with aggregate. Everyone pays directly or indirectly through taxes for the collective cost of aggregate. There is no substitute for aggregate.

75. The Defendants' products are used in major infrastructure projects e.g., highways, tunnels, dams, and airports. The products are used sidewalks, house foundations and driveways. And the products are used to make construction products e.g., bricks, blocks, pipes, culverts, and pre-stressed bridge spans.

76. CRH, plc has operations in 46 states in the United States. It has operations in 30 countries.

77. Vulcan Materials Company has operations in California, Arizona, New Mexico, Texas, Oklahoma, Arkansas, Louisiana, Mississippi, Alabama, Tennessee, Kentucky, Illinois, Georgia, Florida, South Carolina, North Carolina, Virginia, Maryland, Delaware, Pennsylvania.

78. Thus, the Defendants operate companies entrusted with managing America's natural resources and provide products and services for vital infrastructure needs, and as shown herein, and are abusing the global financial system to help in covering up illicit business practices.

### 9.3 Further Aggravating Circumstances Are That About 50% of the Defendants' Revenues in the United States Are Derived from Doing Business with Local, State and Federal Government Entities, Which Were Prohibited from Entering into Contracts and Doing Business with Criminal Enterprises.

79. About 50% of the Defendants' revenues in the United States are public works related i.e., jobs and projects done for local districts, cities, counties, the federal government, and their various agencies. Public works projects include a wide classification of projects, financed and constructed by the government, for recreational, education, transportation, employment, and health and safety uses in the greater community. They include roads, bridges, military bases and defense installations, parks, water supply canals and pipelines, electric power infrastructure, waste

COMPLAINT

32

handling and disposal facilities and sites, railroads, schools, hospitals, prisons, government administrative buildings, beaches, and other, usually long-term, physical assets and facilities.

80. The common denominator in public works projects is the use of funds collected from the public for a specific purpose i.e., property taxes, value added taxes (sales taxes), transportation fuel taxes, income taxes and a wide variety of special assessments collected pursuant to legislation passed by the legislature in Washington D.C., state capitols, county governments, city governments and local districts. Public works projects are typically managed by contractors hired by the government.

81. The CRH Entities provide materials, products and construction contracting services to public works projects.

82. The Vulcan Entities are principally focused on providing materials.

83. Local, state, and federal government entities, for obvious reasons, were prohibited from entering into contracts and doing business with criminal enterprises. E.g., see: Public Contracts 41 U.S.C. §§ 101 – 8707; the Arizona Procurement Code, A.R.S. 41-2501 et. seq., and administrative rules and regulations A.A.C. R2-7-101 et. seq.; the California Public Contract Code https://leginfo.legislature.ca.gov/faces/codesTOCSelected.xhtml?tocCode=PCC&tocTitle=+Public+Contract+Code+-+PCCs Tree - Public Contract Code - PCC (ca.gov); and in the State of Texas, Texas Government Code Title 10 Subtitle F, State and Local Contracts and Fund Management, Chapter 2269 Contracting and Delivery Procedures for Construction Projects https://statutes.capitol.texas.gov/Docs/GV/htm/GV.2269.htm.

## 10. Plaintiff is First Applying the Declaratory Judgment Act to the Criminal Source of the Defendants' Money Laundering, the Property That Represents the Proceeds of Specified Unlawful Activity. 28 U.S.C. §§ 2201-2202.

84. In the first phase of this action, Plaintiff is applying the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ("Act").

85. The Act authorizes broad-based declaratory and injunctive relief.

86. Section 1 of the Act provides, in relevant part:

COMPLAINT

33

In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such.

28 U.S.C. § 2201(a)

87. Section 2 of the Act specifies that:

"[f]urther necessary or proper relief based upon a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

28 U.S.C. § 2202

88. FRCP 57, adopted pursuant to the Act, provides that (1) a jury trial is authorized if otherwise available for the claims presented and (2) an applicant for a declaratory judgment may seek a speedy hearing on the court's calendar. Such relief may include damages or injunctive remedies, which are considered ancillary to the enforcement of the declaratory judgment. *United Teacher Associates Insurance Company v. Union Labor Life Insurance Company*, 414 F.3d 558, 570 (5th Cir. 2005); *Ashmus v. Calderon*, 123 F.3d 1199, 1206 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 740 (1998).

89. A party seeking declaratory relief under the statute must present an "actual controversy" in order to satisfy the "case or controversy" requirement of Article III. 28 U.S.C. § 2201(a). The Supreme Court addressed this requirement in the context of a declaratory judgment action in *MedImmune v. Genentech*, 549 U.S. 118 (2007). Also *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325 (1936) (upholding constitutionality of the Act under Article III); *Already LLC v. Nike Incorporated*, 133 S. Ct. 721, 726-27 (2013); *Columbian Financial Corporation v. BancInsure Incorporated,* 650 F.3d 1372 (10th Cir. 2011) (*applying MedImmune* decision); *Prasco LLC v. Medicis Pharmaceutical Corporation*, 537 F.3d 1329, 1336 (Fed. Cir.

COMPLAINT                                                                                            34

2008) (*applying MedImmune* decision). The Declaratory Judgment Act was not intended as a device for rendering mere advisory opinions. The case must involve a controversy that is substantial and concrete, must touch the legal relations of parties with adverse interests, and must be subject to specific relief through a decree of conclusive character. *Aetna Life Insurance Company*, 300 U.S. at 240-41.

90. Case No. CV10-1776 VBF-OP and Case No. 2:15-cv-00701-VBF-AS have been corruptly adjudicated. Plaintiff has a right to require that the courts of the United States act within the judicial power of the United States. Pursuant to *Hagans v. Lavine*, 415 U.S. 528, 538 (1974) any use of federal courts without merit causes the federal courts to lack subject-matter jurisdiction. Subject-matter jurisdiction is an Article III as well as a statutory requirement and functions as a restriction on federal power and contributes to the characterization of the federal sovereign. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982). Plaintiff has a legal entitlement to business relations and property rights unhampered by schemes prohibited by the RICO predicate statutes. 18 U.S.C. §§ 1962(c), 1961(1); See *Dumas v. Major League Baseball Prop.*, 104 F.Supp.2d 1220, 1222 (S.D. Cal. 2000), aff'd sub nom. Also see *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, (9th Cir. 2002).

91. In this regard, Plaintiff intends to subpoena these documents and things related to Case No. CV10-1776 VBF-OP and derivative cases.

1. The contract between the Inland ESOP and Rune Kraft and Kraft Americas, L.P. to provide brokerage services and/or any other kinds of services ("Contract").

2. The documents showing any payments made by the Inland ESOP to Rune Kraft and Kraft Americas, L.P. pursuant to the Contract.

3. The documents related to the December 17, 2007 transaction in which the Inland ESOP sold 100% of its shares in Inland, Inc.

4. The December 31, 2006 opinion of the Fair Market Value of the common stock of Inland, Inc. assessed as a controlling interest and going concern basis, which was approximately $20,690,000, or $180.00 per share based on 114,687 total common shares outstanding.

5. The disc containing the six electronic files the Inland Parties' attorneys received from Rune Kraft as part of discovery in Case No. CV10-1776 VBF-OP on November 15, 2010.

6. All RICO complaints Rune Kraft has filed against the Inland ESOP.

COMPLAINT                                                                                          35

92. Plaintiff seeks to have the district court order: (1) that Case No. CV10-1776 VBF-OP is not within the judicial power of the United States making the Orders of Case No. CV10-1776 VBF-OP, and derivatively Case No. 2:15-cv-00701-VBF-AS, void, and requiring the court to apply 18 U.S.C. §§ 1961 *et seq.* in Case No. 2:15-cv-00701-VBF-AS; (2) that any public records related in any manner to the corrupt adjudication of Case No. CV10-1776 VBF-OP and Case No. 2:15-cv-00701-VBF-AS be removed; and (3) that any transactions, including derivative transactions, are invalidated.

93. The Plaintiff presents an "actual controversy" and thus satisfies the controversy requirement of Article III.

94. Federal courts generally have "virtually unflagging obligation" to entertain and resolve disputes within their jurisdiction and may abstain from exercising that jurisdiction only under "exceptional circumstances". *Colorado River Water Conservation District v. United States*, 424 U.S. at 817, 96 S. Ct. 1236.

95. It is well settled that the district courts' exercise of discretion should be informed by a number of prudential factors, including: (1) considerations of practicality and efficient judicial administration; (2) the functions and limitations of the federal judicial power; (3) traditional principles of equity, comity, and federalism; (4) Eleventh Amendment and other constitutional concerns; and (5) the public interest. *Wilton*, 515 U.S. at 288; *Green v. Mansour*, 474 U.S. 64, 72-74 (1985); *Public Affairs Associates, Incorporated v. Rickover*, 369 U.S. 111 at 112-13 (1962); *Public Service Commission of Utah v. Wycoff Company*, 344 U.S. 237, 243-47 (1952).

96. The Supreme Court has emphasized that "our task in cases such as this is not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice... to justify the surrender of that jurisdiction." *PaineWebber, Inc. v. Alfred M. Cohen*, 276 F.3d at 208 (6th Cir. 2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. at 25-26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).

97. In addition, doubts as to whether a particular factor exists in the abstention determination should be resolved against a stay, for "only the clearest of justifications will warrant abstention." *Colorado River*, 424 U.S. at 819, 96 S. Ct. 1236.

COMPLAINT

36

98. Because exceptional circumstances do not exist to overcome the Court's "unflagging obligation" to exercise its jurisdiction, abstention is not warranted.

99. Perhaps the most important factors are whether a declaratory judgment will serve a useful purpose and resolve the controversy between the parties. *Wilton*, 515 U.S. at 288; *Green*, 474 U.S. at 73; *Wycoff*, 344 U.S. at 244.

100. The action seeks to resolve the controversy, which is a useful purpose.

## 10.1 The Constitutional Limitations on Federal Jurisdiction Make Federal Courts "Courts of Limited Jurisdiction".

101. The Constitution creates the federal judicial power and defines the maximum extent of that power:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.
>
> . . .
>
> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and Consuls; to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party; to Controversies between two or more States; between a State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects..
>
> U.S. Const. art. III, § 2.

102. The constitutional limitations on federal jurisdiction make federal courts "courts of limited jurisdiction," *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978), as opposed to state courts, which are generally presumed to have subject-matter jurisdiction over a case. See 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Practice and Procedure* § 3522, p. 100 (3d ed. 2008) [hereinafter 13 Wright & Miller].

103. The Constitution "authorizes Congress . . . to determine the scope of federal courts' jurisdiction within constitutional limits." *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).

COMPLAINT

37

104. Although the Constitution defines the maximum extent of judicial power, the Constitution gives Congress the authority, "[w]ithin constitutional bounds, [to] decide[] what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007).

105. Thus, Article III courts are "empowered to hear only those cases that (1) are within the judicial power of the United States, as defined in the Constitution, and (2) that have been entrusted to them by a jurisdictional grant by Congress." 13 Wright & Miller § 3522, p. 100; see generally 13 Wright & Miller § 3521.

## 10.2 The Requirement That Jurisdiction Be Established as A Threshold Matter Is 'Inflexible and Without Exception'.

106. "The requirement that jurisdiction be established as a threshold matter is 'inflexible and without exception,' " id., at 94 95 (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)); for "jurisdiction is power to declare the law," and " 'without jurisdiction the court cannot proceed at all in any cause,' " 523 U.S., at 94 (quoting Ex parte McCardle, 7 Wall. 506, 514 (1869)). *See Ruhrgas AG v. Marathon Oil Co. et al.*, 526 U.S. 574 (1999).

107. Proceedings in a court of law to determine the personal rights and obligations of parties over whom the court has no jurisdiction are invalid for want of due process of law. *Pennoyer v. Neff*, 95 U.S. 714 (1878).

108. And this is also the law in Maricopa County, Arizona "A judgment entered by default, however, is invalid if the court lacked personal jurisdiction over the defendant". A court of the State of Arizona cannot assume *in personam* jurisdiction over an out-of-state party without serving the out-of-state party with a summons and complaint and adhering to traditional due process notions of fair play and substantial justice. *Smith & Wesson Corp. v. The Wuster*, Arizona Court of Appeals, Division One, CA - CV 16 – 0378.

## 10.3 The Courts of the United States of America Have Been Used Without Jurisdiction, Which Means That Their Orders Are Not Voidable, But Void

109. According to the Supreme Court, *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015)

110. Pursuant to *Hagans v. Lavine*, 415 U.S. 528, 538 (1974) any use of federal courts without merit causes the federal courts to lack subject-matter jurisdiction.

111. Subject-matter jurisdiction is an Article III as well as a statutory requirement and functions as a restriction on federal power and contributes to the characterization of the federal sovereign. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).

112. Subject-matter jurisdiction is an issue the district courts of the United States have **zero** discretionary authority over.

113. Specifically, the Inland ESOP had not suffered an injury. See Section 3 herein.

114. And the Inland ESOP had not even hired Rune Kraft and Kraft Americas, L.P. making it impossible to have been injured by reason of having hired Rune Kraft and Kraft Americas, L.P. See Section 3 herein.

115. Plaintiff has a legal entitlement to business relations and property rights unhampered by schemes to use federal courts without subject-matter jurisdiction.

116. In brief: federal courts are being used to commit theft; this use of the district courts is not a meritorious use of the courts; the use of the district courts to commit theft causes the district courts to be without subject-matter jurisdiction; federal courts have an obligation to inquire about subject-matter jurisdiction; federal courts always have jurisdiction to determine their own jurisdiction, which they have refused to do.

117. As shown by Section 3 herein, Case No. CV10-1776 VBF-OP lacks subject-matter jurisdiction.

118. The Inland ESOP never hired the Plaintiff to serve as its broker, never paid the Plaintiff to serve as its broker, and it follows could thus never have been injured as a result of having hired the Plaintiff to serve as its broker, and in the relevant transaction it actually had a $3 million gain, not a $3 million loss ("subject-matter jurisdiction determination").

COMPLAINT

39

119. A federal court always has jurisdiction to determine its own jurisdiction. *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am.*, 330 U.S. 258, 291 (1947).

120. In order to make that determination, it was necessary for the district court to address the merits, and particularly so after Kraft swore into the records of the district court under penalty of perjury that the district court was being used as a conduit of theft, establishing an affirmative obligation on the district court to compel the parties asserting jurisdiction to prove that the district court has jurisdiction over the subject-matter, and this showing must be made by a preponderance of the evidence. *McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc.*, 298 U.S. 178, 189 (1936). Any use of federal courts without merit causes the federal courts to lack subject-matter jurisdiction. *Hagans v. Lavine*, 415 U.S. 528, 538 (1974). Subject-matter jurisdiction is an Article III as well as a statutory requirement and functions as a restriction on federal power and contributes to the characterization of the federal sovereign. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).

121. Federal Rule 12(h)(3) states that, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

122. "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citations omitted); see also *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject-matter, the court shall dismiss the action.").

123. On appeal—even for the first time at the Supreme Court—a party may attack jurisdiction after the entry of judgment in the district court. See *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

124. Even the party that had invoked the district court's jurisdiction can argue on appeal, to avoid an adverse judgment, that the district court lacked jurisdiction. 13 Wright & Miller § 3522, pp. 122–23 ("Indeed, the independent establishment of subject-matter jurisdiction is so important that a party ostensibly invoking federal jurisdiction may later challenge it as a means of avoiding an adverse result on the merits."). See also: *City of Rome, NY v. Verizon Commc'ns Inc.*,

COMPLAINT                                                                                                40

362 F.3d 168, 174 (2d Cir. 2004) (quoting *United States v. Leon*, 203 F.3d 162, 164 n.2 (2d Cir. 2000)) ("As we have often observed, 'it is well settled that lack of federal jurisdiction may be raised for the first time on appeal, even by a party who originally asserted that jurisdiction existed, or by the Court *sua sponte*.'"); *Levin v. ARDC*, 74 F.3d 763, 766 (7th Cir. 1996) ("Subject-matter jurisdiction cannot be waived and may be contested by a party or raised *sua sponte* at any point in the proceedings."); *Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1202 (9th Cir. 2007) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *Galvez v. Kuhn*, 933 F.2d 773, 775 n. 4 (9th Cir. 1991)) ("Defects in subject matter jurisdiction are nonwaivable and may be raised at any time, including on appeal."); 13 Wright & Miller § 3522, pp. 122–26.

125. A federal court lacks jurisdiction over a claim involving federal law "only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (jurisdiction lacking on standing grounds) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

126. "The test for dismissal is a rigorous one and if there is any foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller § 3564, pp. 244–45.

127. The Supreme Court has stated this test in multiple ways and in *Hagans v. Lavine* collected several of the various statements for this test:

> Over the years this Court has repeatedly held that the federal courts are without power to entertain claims otherwise within their jurisdiction if they are "so attenuated and unsubstantial as to be absolutely devoid of merit," *Newburyport Water Co. v. Newburyport*, 537 U.S. 561, 579 (1904); "wholly insubstantial," *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); "obviously frivolous," *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288 (1910); "plainly unsubstantial," *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105 (1933); or "no longer open to discussion," *McGilvra v. Ross*, 215 U.S. 70, 80 (1909).

415 U.S. 528, 536–37 (1974).

128. "The substantiality requirement seems to conflate, or perhaps to confuse, the jurisdictional inquiry and the determination of the merits. . . . But the Court has said, 'it remains

the federal rule . . . .'" 13D Wright & Miller § 3564, p. 247 (quoting *Hagans v. Lavine*, 415 U.S. 528, 538 (1974)).

129. The Plaintiff has sworn in facts under penalty of perjury that the district court lacks subject-matter jurisdiction, an Article III as well as a statutory requirement, and despite once the Plaintiff swore those detailed facts into the records of the court, the burden was on Kraft's opponents to prove that the court has jurisdiction over the subject-matter, and this showing must be made by a preponderance of the evidence, the district court ignored the issue.

130. As the Supreme Court notably proclaimed in *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), no action of the parties can confer subject-matter jurisdiction upon a federal court, thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.

131. The Defendants' use of the district courts of the United States related to this matter is not within the judicial power of the United States, as defined in the Constitution, and this matter has not been entrusted to federal courts by a jurisdictional grant by Congress.

132. The district courts are courts of limited jurisdiction and have had no authority to do what they have been doing because of lack of subject-matter jurisdiction.

133. A federal court has the authority to determine whether it has jurisdiction to hear a particular case. *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am.*, 330 U.S. 258, 291 (1947)). See also: *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 374 (2d Cir. 2005) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 292 (1947) ("'[A] court has jurisdiction to determine its own jurisdiction.'"); *Knudsen v. Liberty Mut. Ins. Co.*, 411 F.3d 805, 808 (7th Cir. 2005) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)) ("'[A] federal court always has jurisdiction to determine its own jurisdiction.'"); *In re Bunyan*, 354 F.3d 1149, 1152 (9th Cir. 2004) (citing *United States v. Ruiz*, 536 U.S. 622, 628 (2002)) ("A federal court always has jurisdiction to determine its own jurisdiction."); 13D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Richard D. Freer, *Federal Practice and Procedure* § 3536, p. 1 ("'Jurisdiction to determine jurisdiction' refers to the power of a court to determine whether it has authority over the parties to and the subject matter of a suit.") [hereinafter 13D Wright & Miller].

COMPLAINT

42

134. The issue of federal subject-matter jurisdiction "concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." 13 Wright & Miller § 3522, p. 125.

135. "It is to be presumed that a cause lies outside [of federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). See also: *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447 (7th Cir. 2005) ("That the proponent of jurisdiction bears the risk of non-persuasion is well established.") (citations omitted); *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679 (7th Cir. 2006) ("In general, of course, the party invoking federal jurisdiction bears the burden of demonstrating its existence.") (citations omitted); 13D Wright & Miller § 3522, pp. 103–05 ("[T]here is a presumption that a federal court lacks subject matter jurisdiction, and the party seeking to invoke federal jurisdiction must affirmatively allege the facts supporting it."); 13D Wright & Miller § 3522, pp. 104–07 ("If these facts are challenged, the burden is on the party claiming jurisdiction to prove that the court has jurisdiction over the subject matter. . . . This showing must be made by a preponderance of the evidence."); 15 *Moore's Federal Practice* ¶ 102.14 (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc.*, 298 U.S. 178, 189 (1936) ("The burden of proving all jurisdictional facts is on the party asserting jurisdiction.")

136. In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), the Supreme Court noted that

> Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, *California v. LaRue*, 409 U. S. 109 (1972), principles of estoppel do not apply, *Am. Fire & Casualty Co. v. Finn*, 341 U. S. 6, 17-18 (1951), and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.

*Id.* at 702. See also *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). And see: *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373 (9th Cir. 1997) ("This is not to say that a defect in jurisdiction can be avoided by waiver or stipulation to submit to federal jurisdiction. It cannot."); *Richmond*

COMPLAINT                                                                                  43

*v. Chater*, 94 F.3d 263, 267 (7th Cir. 1996) ("Jurisdiction cannot be stipulated."); *ER Squibb & Sons v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998) (expressing concerns about whether court had jurisdiction and remanding for further adjudication of jurisdiction issues) ("[N]o amount of agreement by the parties can create jurisdiction where none exists."); 13 Wright & Miller § 3522, p. 115 (noting that the actions of a party cannot vest a court with jurisdiction outside of the constitutional and congressional grants of jurisdiction).

137. All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). See also: *Sharkey v. Quartantillo*, 541 F.3d 75, 87–88 (2d Cir. 2008) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir.2000)) ("To the extent the threshold limitations are jurisdictional, we are required to raise them *sua sponte*."); *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992 (7th Cir. 2007) (citing *St. Paul Mercury & Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 287 n.10 (1938); *Andrews v. E.I. Du Pont De Nemours and Co.*, 447 F.3d 510, 514 (7th Cir. 2006)) ("While neither party raised the matter of jurisdiction, we have an independent obligation to ensure that jurisdiction exists."); *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 184 (9th Cir. 2006) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)) ("Of course, we have an independent obligation to satisfy ourselves that we have jurisdiction."); 13 Wright & Miller § 3522, p. 126 ("Even if the parties remain silent, a federal court, whether trial or appellate, is obliged to notice on its own motion its lack of subject matter jurisdiction, or the lower court's lack of subject matter jurisdiction when a case is on appeal.").

138. And derivatively the orders of Case No. 2:15-cv-00701-VBF-AS are void.

139. According to FRCP 41(b) orders issued by courts that lack jurisdiction are not claim preclusive and are not considered an adjudication "on the merits".

140. This is also *stare decisis*.

141. If a court acts "without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a remedy sought in opposition to them, even prior to a reversal. They constitute no justification, and all persons concerned in executing

COMPLAINT                                                                                                44

such judgments or sentences are considered in law as trespassers." *Elliott v. Lessee of Piersol*, 26 U.S. 328, 1 Pet. 328 (1828).

142. A void judgment is one which, from its inception, was a complete nullity and without legal effect. This is a universal standard in America's legal system. E.g., see Black's Law Dictionary, Sixth Edition, page 1574: Void judgment.

143. It follows, *res judicata* does not apply to any Orders of Case No. CV10-1776 VBF-OP.

## 11. The Defendants Use Their Considerable Financial Resources to Corruptly Grease the Wheels of Justice of the Courts of the United States of America.

### 11.1 The Defendants Use Both In-House and Outside Attorneys. However, They Are All Officers of the Court, and Cannot Advice, Assist and/or Further Criminal Activities and Fraudulent Schemes.

144. As shown in paragraphs 25 and 26, Craig Hall and David M. Toolan have been the CRH Entities in-house legal counsel in the United States. And both attorneys have been members of the State Bar of Georgia.

145. As shown throughout the 3,761 predicate acts, related to this matter, the Defendants used outside attorneys in California, Arizona, Colorado and New Mexico, all members of the respective state bar associations.

146. The RICO Act, 18 U.S.C. §§ 1961–1968, makes the persons involved with these fraudulent schemes the members of a criminal enterprise: an associated-in-fact enterprise (an actor) are engaging in a series of predicate acts, 18 U.S.C. § 1961(1), that are defined as racketeering activity because the acts violate 18 U.S.C. §§ 1341, 1343, 1512(c), 1503(a), 1956(a), 1956(h) 1957(a), 1344(1), 1344(2) and the enterprise engaged in a conspiracy to commit mail fraud, wire fraud and obstruction of justice in violation of 18 U.S.C. § 1962(d). *United States v. Turkette*, 452 U.S. 576, 580-87 (1981).

COMPLAINT

45

147. Attorneys who are members of the state bar associations in California, Arizona, Colorado, New Mexico, and Georgia cannot advice or assist criminal enterprises.

148. The rules of each of these bar associations are modeled after the rules of the American Bar Association and are therefore similar.

149. And these rules are adopted by the Federal District Courts in those states.

150. For example, as to California, the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto are adopted by the U.S. District Court for the Central District of California.

**The State Bar Act - § 6068 Duties of Attorney**, declares in relevant parts:
It is the duty of an attorney to do all of the following:
(a) To support the Constitution and laws of the United States and of this state.
(b) To maintain the respect due to the courts of justice and judicial officers.
(c) To counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of a person charged with a public offense.
(d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.
(f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.
(g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.

151. **The Rules of Professional Conduct of the State Bar of California**, dictates in relevant parts:

**Rule 1.2.1 Advising or Assisting the Violation of Law**
(a) A lawyer shall not counsel a client to engage, or assist a client in conduct that the lawyer knows is criminal, fraudulent, or a violation of any law, rule, or ruling of a tribunal.
Comment [5] If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by these rules or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must advise the client regarding the limitations on the lawyer's conduct. (See rule 1.4(a)(4).)

**Rule 1.16 Declining or Terminating Representation**
(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation
of a client if:

COMPLAINT

46

(1) the lawyer knows or reasonably should know that the client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person;

(2) the lawyer knows or reasonably should know that the representation will result in violation of these rules or of the State Bar Act;

**Rule 3.1 Meritorious Claims and Contentions**

(a) A lawyer shall not:

(1) bring or continue an action, conduct a defense, assert a position in litigation, or take an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person; or

(2) present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by a good faith argument for an extension, modification, or reversal of the existing law.

**Rule 3.2 Delay of Litigation**

In representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense.

**Rule 3.3 Candor Toward the Tribunal**

(a) A lawyer shall not:

(1) knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel, or knowingly misquote to a tribunal the language of a book, statute, decision or other authority; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence, and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal, unless

disclosure is prohibited by Business and Professions Code section 6068, subdivision (e) and rule 1.6.

(b) A lawyer who represents a client in a proceeding before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures to the extent permitted by Business and Professions Code section 6068, subdivision (e) and rule 1.6.

**Rule 3.7 Lawyer as Witness**

(a) A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless:

(1) the lawyer's testimony relates to an uncontested issue or matter;

(2) the lawyer's testimony relates to the nature and value of legal services rendered in the case; or

(3) the lawyer has obtained informed written consent from the client. If the lawyer represents the People or a governmental entity, the consent shall be obtained from the head of the office or a designee of the head of the office by which the lawyer is employed.

**Rule 8.4 Misconduct**
It is professional misconduct for a lawyer to:
(a) violate these rules or the State Bar Act, knowingly assist, solicit, or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice;

152. As to the **Local Rules of the U.S. District Court for the Central District of California,** these rules dictate in relevant parts:

L.R. 5-4.3.4 declares that "any filing in accordance with this L.R. 5-4.3.4 shall bind the signatories as if the document were physically signed and filed, whether for purposes of Rule 11 of the Federal Rules of Civil Procedure, to attest to the truthfulness of an affidavit or declaration, or for any other purpose."

L.R. 83-3.1.2 proclaims that "in order to maintain the effective administration of justice and the integrity of the Court, each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. The Model Rules of Professional Conduct of the American Bar Association may be considered as guidance."

L.R. 11-9 authorizes sanctions: "The presentation to the Court of frivolous motions or opposition to motions (or the failure to comply fully with this rule) subjects the offender at the discretion of the Court to the sanctions of L.R. 83-7."

L.R. 83-7 further specifies that "the violation of or failure to conform to any of these Local Rules may subject the offending party or counsel to:

COMPLAINT

48

(a) monetary sanctions, if the Court finds that the conduct was willful, grossly negligent, or reckless;

(b) the imposition of costs and attorneys' fees to opposing counsel, if the Court finds that the conduct rises to the level of bad faith and/or a willful disobedience of a court order; and/or

(c) for any of the conduct specified in (a) and (b) above, such other sanctions as the Court may deem appropriate under the circumstances."

153. The judges of the district court, having acted collectively under the authority of Congress, 28 U.S.C. § 2071, have issued local rules. "Those rules have 'the force of law." *Weil* v. *Neary*, 278 U. S. 160, 169 (1929).

154. As the Supreme Court held in *Hollingsworth v. Perry*, 558 U.S. 183, 192 (2010), rules of court, no less than other regulations, are binding, not just on the parties, but the court itself. "If courts are to require that others follow regular procedures, courts must do so as well." 558 U.S. at 199. Any change to the rules may not be implemented by a single judge in a particular case but must be initiated by the full court pursuant to its rule-making processes and subject to the requirement of public notice-and-comment. *Id.* at 193. "The Court's interest in ensuring compliance with proper rules of judicial administration is particularly acute when those rules relate to the integrity of judicial processes." *Id.* at 196.

## 11.2 Nevertheless, In-House Attorneys in Georgia, In Exchange for a Share of The Criminally Derived Property, Were Able to Lure Attorneys in California, Arizona, Colorado, and New Mexico to Support the Plan.

155. As shown throughout the 3,761 predicate acts, related to this matter, the CRH Entities in-house legal counsel in Georgia, in exchange for a share of the criminally derived property, were able to lure attorneys who supported the plan: in California (Joseph C. Faucher et al.); in Arizona (Steven Gregory Jones et al.); in Colorado (Ronald A. Podboy and Jamie H. Rezmovits); and in New Mexico (Jesse C. Hatch and Stanley N. Hatch). And CalMat Co.'s attorney in New Mexico (Douglas R. Vadnais) joined in to collect his share.

COMPLAINT

49

**11.3 FRCP 11(b), the Rules of Professional Conduct for Attorneys in Georgia, California, Arizona, Colorado, and New Mexico and the Local Rules of the Federal District Courts in California, Arizona, Colorado, and New Mexico Prohibit Rendering Legal Services in Exchange for a Share of Criminally Derived Property.**

156. The CRH Entities' attorneys, in-house and outside, have been and are being paid to render legal services in exchange for some of the profits of a criminal enterprise. The same goes for CalMat Co.'s attorney in New Mexico.

157. 18 U.S.C. § 1956(a)(1) reads as follows: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity … (A)(i) with the intent to promote the carrying on of specified unlawful activity … shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

158. Further 18 U.S.C. § 1956(h) recites that "any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy".

159. *United States v. Santos*, 553 U.S. 507 (2008) precisely defines the term "proceeds" in the federal money-laundering statute, 18 U. S. C. §1956(a)(1), as meaning "profits."

160. The CRH Entities attorneys, regardless of being in-house or outside, cannot engage in or take part in prohibited activities. The same goes for the Vulcan Entities attorney.

## 12. *United States v. Turkette*, 452 U. S. 576 (1981), 18 U.S.C. § 1961(4)

161. Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4)

162. The Defendants are an "enterprise". See 18 U.S.C. § 1961(4).

COMPLAINT

50

163. The Supreme Court of the United States has also approved of both legitimate and illegitimate enterprises, even though the statute does not encompass both explicitly. See *United States v. Turkette*, 452 U.S. 576, 580-87 (1981).

164. This action is based upon violations of federal criminal statutes (see 18 U.S.C. § 1961(1)(B)). The nexus with interstate commerce is thus necessarily established by the commission of the underlying federal crime. See *United States v. Urban*, 404 F.3d 754, 767 (3d Cir. 2005) (stating that the government/plaintiff "need only prove that Hobbs Act extortion *potentially* affected interstate commerce"). Moreover, because the U.S. Constitution confers the postal powers upon the federal government, acts of mail fraud, even intrastate use of the mails, have an inherent nexus with interstate commerce. *United States v. Elliott*, 89 F.3d 1360 (8th Cir. 1996). Defendants' Enterprise engages in, and its activities have an effect on, interstate commerce in connection with *inter alia*, the Enterprise's businesses, suing for alleged infringement of certain issues without an objective basis and for the illegitimate purpose of bolstering the *in terrorem* effect of its fraudulent schemes. The Enterprise uses the instrumentalities of interstate travel, interstate mailings, and interstate wires, and it purchases goods and services from various U.S. states – including in connection with the Defendants' unlawful activities. In *United States v. Beasley*, 72 F.3d 1518 (11th Cir.), *cert. denied*, 518 U.S. 1027 (1996), the court held that "[t]o satisfy [RICO's] interstate commerce requirement, only a slight effect on interstate commerce is required." *Id.* at 1526; see also *United States v. Riddle*, 249 F.3d 529, 538 (6th Cir.), *cert. denied*, 534 U.S. 930 (2001) ("a *de minimus* connection suffices for a RICO enterprise that 'affects' interstate commerce"). The CRH Entities have operations in 46 states and the Vulcan Entities have operations in 20 states.

165. This illegal scheme systematically: uses the mail and the wire to transmit false and fraudulent documents and to further the fraudulent scheme in violation of 18 U.S.C. §§ 1341 and 1343; obstructs justice in violation of 18 U.S.C. §§ 1512(c) and 1503(a); engages in money laundering in violation of 18 U.S.C. §§ 1956(a), 1956(h) 1957(a); and commits bank fraud in violation of 18 U.S.C. §§ 1344(1) and 1344(2). Following in the footsteps of the Supreme Court in *Turkette,* under a preponderance standard this associated-in-fact enterprise (the actor) has engaged in a series of predicate acts, 18 U.S.C. § 1961(1), that are defined as racketeering activity and the enterprise engaged in conspiracy to commit mail fraud, wire fraud and obstruction of

COMPLAINT

51

justice in violation of 18 U.S.C. § 1962(d). The Defendants have violated the Racketeer Influenced Corrupt Organization Act. 18 U.S.C. § 1962.

166. The Defendants exploited misrepresentations and/or omissions and implemented a campaign to force Plaintiff and others to bear the burden of investigating and applying law to them. As stated herein, the Defendants, individually or collectively, and through the conduct of the Enterprise, engaged in numerous acts of fraud and/or have devised an overall scheme or artifice to defraud, and are attempting to commit fraud and carry out such schemes, for instance, conspiracy to commit mail fraud, wire fraud and obstruction of justice in violation of 18 U.S.C. § 1962(d), acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 respectively; acts of obstruction of justice in violation of 18 U.S.C. §§ 1512(c) and 1503; acts of money laundering and monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1956(a), 1956(h) and 1957(a) correspondingly, and acts of bank fraud in violation of 18 U.S.C. §§ 1344(1) and 1344(2), which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means. Having knowledge of the falsity and/or fraudulent incompleteness of the representations, all in an effort to deprive the Defendants' targets of money and property that Defendants' had no right to seek or obtain.

## 13. *Salinas* v. *United States*, 522 U. S. 52 (1997), 18 U.S.C. § 1962(d)

167. A RICO claim is broad, but a RICO conspiracy claim is even broader. 18 U.S.C. § 1962(d). Anyone who agrees or conspires to pursue the same criminal objective can be held liable for a RICO violation.

168.

"If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."

*Salinas v. United States*, 522 U.S. 52, 63-64 (1997) at 64.

169. A conspirator must simply intend to further an endeavor which, if completed, would satisfy all elements of a civil RICO claim. *Id.* at 65; *see also CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (one conspires to violate RICO by adopting the

COMPLAINT                                                                 52

goal of furthering the enterprise, "even if the conspirator does not commit a predicate act"); *United States v. Godwin,* 765 F.3d 1306, 1324 (11th Cir. 2014); *United States v. Godwin,* 765 F.3d 1306, 1324 (11th Cir. 2014) ("[i]n proving the existence of a single RICO conspiracy, the government does not need to prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or contemplated participating in the same related crime"); *United States v. Kamahele,* 748 F.3d 984, 1006 (10th Cir. 2014) (stating that "the Government does not need to prove that each defendant personally committed two predicate acts to prove a RICO conspiracy" and that "[t]he focus of this element is on the particular Defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity, and not on the particular Defendant's agreement to commit the individual acts"); *United States v. Zemlyansky,* 908 F.3d 1, 10 (2d Cir. 2018) (stating that "a jury's finding that a defendant did not commit certain substantive crimes does not necessarily preclude the government from later proving that he or she knowingly agree to facilitate the racketeering scheme involving, or intending to involve, the same substantive crimes").

## 14. *Sedima, S.P.R.L.* v. *Imrex Co.,* 473 U. S. 479 (1985), 18 U.S.C. §§ 1962, 1964(c).

170. When the legislature of the United States enacted the RICO Act, Congress specifically intended to create a private right of action.

171.

"RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

*Sedima S.P.R.L. v. Imrex Co.* 473 U.S. 479, 105 S.Ct. 3275

COMPLAINT

53

## 15. Plaintiff is Second Applying the Racketeer Influenced and Corrupt Organizations Act to the Defendants' Criminal Conduct. 18 U.S.C. §§ 1961-1968

172. A RICO violation "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," in addition to proving standing. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (The Court adapted this list of requirements from 18 U.S.C. § 1962.)

173. 18 U.S. Code CHAPTER 96— RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS contain: 18 U.S. Code § 1961. Definitions and 18 U.S.C. § 1961(1)(B) defines mail fraud, wire fraud, obstruction of justice and conspiracy to commit money laundering (18 U.S.C. §§ 1341, 1343, 1512(c), 1503, 1956(h)) as predicate acts.

174. 18 U.S. Code § 1962 declares:

Prohibited activities

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

COMPLAINT

54

## 16. The Defendants Were Involved in Actual or Attempted Financial Transactions, Which the Defendants Then Knew Involved the Proceeds of Unlawful Activity, With the Intent to Promote the Specified Unlawful Activity of Bank Fraud. 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(c)(7)(A), 1957(a), 1344(1), 1344(2), 1961(1)

### 16.1 The Pre-Layering, the Conduct That Violated 18 U.S.C. § 1512(c)

175. In order to obtain subject-matter jurisdiction, it was represented to the U.S. District Court for the Central District of California that Kraft had served as a broker and had caused damages serving in that role. However, in truth and in fact, Kraft was not hired to serve as a broker, and could therefore not have caused damages having served in that role. And the Inland ESOP had not only suffered no damages but had gained $ 3 million.

176. 18 U.S.C. § 1503(a) prohibits a person from "corruptly … endeavor [ing] to influence, obstruct, or impede, the due administration of justice." False representations were made, the representations were material to the court's subject matter jurisdiction, the representations were made with the knowledge that they were false, and the representations were made with the intent of inducing subject-matter jurisdiction.

177. 18 U.S.C. § 1961 (1)(B) defines obstruction of justice (18 U.S.C. 1503) as predicate acts.

178. 18 U.S.C. §1956(c)(7) declares that the term "specified unlawful activity" means any act or activity constituting an offense listed in section 18 U.S.C. 1961(1) except an act which is indictable under subchapter II of chapter 53 of title 31.

179. Therefore, the fraudulent inducement is obstruction of justice, which is specified unlawful activity.

### 16.2 The Pre-Layering, the Conduct That Violated 18 U.S.C. § 1503(a)

180. To prevent a normal process of adjudication, attorneys fabricated evidence received from Kraft and used this to get the court to proclaim he should neither be allowed to conduct discovery nor defend himself, and that all his court filings should be stricken, which the court did.

COMPLAINT

55

181. 18 U.S.C. § 1512 (c) prohibits a person from "corruptly … altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so."

182. The six electronic files the Inland Parties' attorneys received from Kraft as part of discovery in Case No. CV10-1776 VBF-OP did not contain the anomalies portrayed in court filings. Universal to the six forged electronic documents is that the "Accessed" time is identical – to the second. All six electronic documents were accessed on October 28, 2010 16 minutes and 48 seconds after 3 AM. On all of the true electronic documents, the "Accessed" time is always identical to the "Modified" time - to the second. Also universal to the six forged documents is that they show that the electronic documents were "Accessed" more than 3 years after they were last "Modified" and "Printed". Further universal to the six forged electronic documents is that the "Accessed" time is 18 days before the electronic documents were provided to the Inland Parties by the Plaintiff. How do you modify an electronic document 4 hours before it was created? How do you access six different Microsoft Word files at the same second? How do you access an electronic document to create a print-out of "statistics" 18 days before you receive the electronic documents? The attorneys then stated that since their investigation of the six electronic documents had uncovered that the electronic documents were "Modified" 4 hours before they were "Created" (as proven by the print-out of "statistics" they had generated) the electronic documents had been forged. This conclusion should result into that all his court filings should be stricken. The true facts are that the six electronic documents had been forged or caused to be forged as part of the Fraudulent Scheme to falsely portray that the electronic documents were "Modified" 4 hours before they were "Created".

183. 18 U.S.C. § 1961 (1)(B) defines obstruction of justice (18 U.S.C. 1512) as predicate acts.

184. 18 U.S.C. §1956(c)(7) declares that the term "specified unlawful activity" means any act or activity constituting an offense listed in section 18 U.S.C. 1961(1) except an act which is indictable under subchapter II of chapter 53 of title 31.

185. Therefore, the fabrication of evidence is obstruction of justice, which is specified unlawful activity.

COMPLAINT

56

## 16.3  The Derived Property Is Criminally Derived Property.

186. The fraudulent inducement of jurisdiction and the fabrication of evidence were used to obtain the June 22, 2011 default judgment from Case No. 2:10-cv-01776-VBF (OP).

187. The Defendants conducted or attempted to conduct financial and monetary transactions in Washington, California, Texas, Colorado, Utah, Arizona, New Mexico, Alabama, Georgia, and Ireland using this judgment and the proceeds from the judgment as property.

188. Therefore, the derived property is criminally derived property.

## 17.  Conspiracy to Commit Mail Fraud, Wire Fraud and Obstruction of Justice.

189. The complaint rests on a legal entitlement to business relations and property rights unhampered by schemes prohibited by the RICO predicate statutes. 18 U.S.C. §§ 1962(c), 1961(1); *Dumas v. Major League Baseball Prop.,* 104 F.Supp.2d 1220, 1222(S.D.Cal. 2000), aff'd sub nom.

190. The CRH Parties and the Vulcan Parties, in any combination associated in fact, are an "Enterprise," as defined in 18 U.S.C. § 1961(4) (referred to herein as the "Associated-in-Fact Enterprise"). Specifically, the above entities were and are a union or group that is associated in fact, constitute an ongoing organization, and function as a continuing unit. This is due to, for example, their contractual and financial relationship, their common goal of monetizing the Fraudulent Scheme, and their continuing and substantial interaction and involvement (including through individuals associated with the entities) as alleged herein. These entities were and are associated for a common purpose of engaging in a course of conduct, at least one aspect of which is attempting to extract money from the Fraudulent Scheme through improper means. These entities have relationships among those associated with the Associated-in-Fact Enterprise, including relationships between and among their respective members, executives, and employees. The association between these entities also has longevity sufficient to permit these associates to pursue the Associated-in-Fact Enterprise's purpose, including by virtue of their ongoing contractual and financial relationship, alignment of interests, and ongoing interactions.

COMPLAINT

57

191. The CRH Parties and the Vulcan Parties are "persons," as that term is defined in 18 U.S.C. § 1961(3), who, individually and collectively, conduct and direct the affairs of the Associated-in-Fact Enterprise described above through a continuing pattern of unlawful conduct.

192. The Enterprise engages in, and its activities influence, interstate commerce in connection with *inter alia,* the Enterprise's business of financing the manufacturing and selling of construction materials and construction products and companies that manufacture and sell construction materials and construction products, coercing businesses, and individuals to participate in its fraudulent schemes and suing for alleged infringement of certain laws without an objective basis and for the illegitimate purpose of bolstering the *in terrorem* effect of its fraudulent schemes. The Enterprise has offices throughout the United States. The Enterprise uses the instrumentalities of interstate travel, interstate mailings, and interstate wires, and it purchases goods and services from various U.S. states - including in connection with the Defendants' unlawful activities.

193. In violation of 18 U.S.C. § 1962(c), the Defendants and those acting at their direction have conducted, controlled, and participated in the conduct of the Enterprise's affairs through a pattern of unlawful racketeering activity.

194. The pattern of racketeering activity referred to herein consists of a variety of unlawful schemes which were and are specifically intended to and do use unlawful means and influence to enrich the Defendants and others at the expense of Plaintiff and others. These unlawful schemes involved, for instance: conspiracy to commit money laundering in violation of 18 U.S.C. 1962(d); conspiracy to commit mail fraud, wire fraud and obstruction of justice in violation of 18 U.S.C. 1962(d); acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 respectively; acts of obstruction of justice in violation of 18 U.S.C. §§ 1512(c) and 1503; acts of money laundering and monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1956(a), 1956(h) and 1957(a) correspondingly, and acts of bank fraud in violation of 18 U.S.C. §§ 1344(1) and 1344(2),

195. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through a conspiracy to commit mail fraud, wire fraud and obstruction of justice in violation of 18 U.S.C. § 1962(d) in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Section 17 herein.

COMPLAINT                                                                58

196. As alleged herein, the Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of mail fraud and/or have devised an overall scheme or artifice to defraud, and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. § 1341, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, as described in Predicate Acts 1 through 72.

197. As alleged herein, the Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of wire fraud and/or devised an overall scheme or artifice to defraud and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. § 1343, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, as described in Predicate Acts 73 through 96.

198. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through in numerous acts of obstruction of justice in violation of 18 U.S.C. § 1512(c), which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Predicate Acts 97 through 102.

199. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through in numerous acts of obstruction of justice in violation of 18 U.S.C. § 1503, which constitute "predicate acts" under 18 U. S. C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Predicate Acts 103 through 124.

200. As alleged herein, the Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of money laundering in violation of 18 U.S.C. § 1956(a), which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, as described in Predicate Acts 125 through 1061.

201. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), which constitute "predicate acts" under 18 U.S.C. § 1961 (§ 1956(a)(2)(A) defines

COMPLAINT

59

money laundering and § 1956(c)(7)(A) defines specified unlawful activity as any act or activity constituting an offense listed in section § 1961 (1)) in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Predicate Act 1062.

202. As alleged herein, the Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, as described in Predicate Acts 1063 through 1887.

203. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through in numerous acts of bank fraud in violation of 18 U.S.C. § 1344(1), which constitute "predicate acts" under 18 U. S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Predicate Acts 1888 through 2824.

204. As alleged herein, the Defendants, individually or collectively, conducted the affairs of the Enterprise through in numerous acts of bank fraud in violation of 18 U.S.C. § 1344(2), which constitute "predicate acts" under 18 U. S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, as described in Predicate Acts 2825 through 3761.

205. These predicate acts are related because they had common purposes and goals (such as the unlawful enrichment of the Defendants in violation of any contractual commitments and promises), common methods of commission (for example, the fraudulent use of the mails or wires, and/or misconduct through obstruction of justice using false representations and forgeries), and common participants (Defendants, and those acting at their direction).

206. Each of the foregoing acts of racketeering by the Defendants is related, continuous, ongoing, and part of a pattern of conduct as described in Predicate Acts 1 through 3761 and continuing since at least January 2011. Accordingly, the Defendants, individually or collectively, have engaged and are engaging in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The Defendants' unlawful acts constitute a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(5).

COMPLAINT

207. As a direct and proximate result of the participation in and conduct of the affairs of the Enterprise alleged herein by the Defendants through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiff has been directly and proximately injured in his business and property and is entitled to all remedies available under the law.

208. Plaintiff has been injured by the failure by Inland, Inc. to pay the book account stated based upon an account in writing, including the interest on any past due amount that has accrued at 1.5% per month, compounded monthly. The injury to Plaintiff fairly can be traced to the challenged actions of the Defendants and has not resulted from the independent action of some third party not before the Court. The injury to Plaintiff can be proven and relieved by the Court.

209. The CRH, plc Board of Directors had primary responsibility for the control of the company's Executive Team.

210. And the CRH, plc Executive Team, in particular CEO Albert Manifold, Group Finance Director Senan Murphy, President Global Strategy & Business Development David Dillon, Group General Counsel Isabel Foley, President Building Products Keith Haas and President Americas Materials Randy Lake had primary responsibility for the supervision of their employees, contractors, attorneys or agents in Georgia, Washington, California, Texas, Colorado, Utah, Arizona and New Mexico.

211. It appears that all conduct was acceptable as long as the acts and practices increased the profits, even if the profits were derived from criminal activities. The CRH Managers would be rewarded and they would in turn reward employees, contractors, attorneys, or agents based on performance and the employees, contractors, attorneys or agents would select how the bottom line would be achieved, limited by the instructions from them.

212. The CRH Managers directed, managed, and monitored the Fraudulent Scheme. This fraud scheme comprised an exceptional profitable business. Approximately 100% of the purported value used in the scheme included claims "laundered" through the fraud. The CRH Entities did not disclose to, and actively concealed from, the public, the courts and others the fact that pseudo legal proceedings had produced sham judgments and claims against Plaintiff and others.

213. In public recordings, the CRH Entities and others reported that they had obtained judgments against Plaintiff and others and that Plaintiff and others were their pawn.

COMPLAINT

61

214. Worse still, the public recordings were used by the CRH Entities and others to portray Plaintiff as a person with a bad character that could not be trusted.

## THE CONSPIRACY

215. The Defendants did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, to commit certain offenses against Plaintiff, that is:

(a) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341;

(b) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343; and

(c) to, by use of the means and instrumentalities of interstate commerce, the mails, and wire communications, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with a foreseeable, contemplated and/or existing proceeding before a court the United States, that is to (i) employ devices, schemes, and artifices to defraud participants in such proceedings; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon holders of property and business rights, in violation of Title 18, United States Code, Section 1962(d).

COMPLAINT

62

## PURPOSE OF THE CONSPIRACY

216. It was a purpose of the conspiracy that the Defendants and their conspirators would solicit and obtain property through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds and property.

## MANNER AND MEANS OF THE CONSPIRACY

217. The manner and means by which the Defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

218. It was a part of the conspiracy that the Defendants and their conspirators would create and cause to be created false and misleading court proceedings and records and other documents concerning legal proceeding, through, among other things, the following means:

a. The Defendants and their conspirators would willfully disobey process, create false books and records to produce a legal outcome that solely benefited Defendants and their conspirators, falsify, conceal or cover up by trick or scheme material facts, including the six forged electronic documents and the portrayal of Plaintiff as a forger to deny his rights in the court. This allowed Defendants and their conspirators to convince the legal proceeding court that it was not a proper exercise of the court's discretion to fail to follow what the Defendants had "uncovered".

b. The Defendants and their conspirators would conceal and disguise process, and willfully disobey process, that Plaintiff was a forger who should be denied the guarantee of "due process of law" as clearly set forth in the United States Constitution's Amendment 5 and Amendment 14. The "fraud upon the court" vitiated the entire proceeding. The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice" *(Levine v. United States,* 362 U.S. 610, 80 S.Ct. 1038 (1960), citing *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13 *(1954)).* The Constitution, federal laws and statutes as well as common law have laid great emphasis on procedural and substantive safeguards designed to assure fair trials and proceedings before impartial tribunals in which every defendant stands equal before the law *(United States v.*

COMPLAINT

63

*Sciuto, 521* F.2d 842, *845* (7th Cir. 6 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.")).

c. The Defendants and their conspirators would act with an improper purpose and engage in conduct knowingly and dishonestly with the specific intent to subvert, impede, or obstruct justice and would conceal and disguise in documents and written statements that it was foreseeable and/or contemplatable would end up in court proceedings and/or court proceedings and records the fraud they had perpetrated on the court. The fraudulent "incestuous" transactions in which the Inland ESOP would transfer interests in "winnings" to CRH Entities and then pay attorneys from the proceeds, in order to mask the criminally derived claims of Defendants, to falsely disguise and purportedly "settle" claims of the Inland ESOP, and to falsely value and disguise the nature of Plaintiff's interactions with the Defendants.

219. It was a part of the conspiracy that the Defendants and their conspirators would make and cause to be made false and misleading representations in court proceedings and records and other documents concerning the legal proceeding sent by mail and wire transmissions in interstate commerce to courts and others, and in conversations, presentations, and meetings with officers of the court and others, including the following:

**False Statements Regarding the Six Electronic Documents:**

a. The Defendants and their conspirators would make and cause to be made false and misleading representations concerning six electronic documents they received from Rune Kraft on November 15, 2010. The electronic documents were delivered personally by Rune Kraft to Cesar M. Ibanez, an assistant to the Inland Parties' attorneys, on a CD at 11755 Wilshire Blvd., 10th Floor, Los Angeles, CA 90025 at about 2:00 PM. The six electronic files showed the true times that Rune Kraft had: created, modified, accessed and printed the six electronic documents and that Rune Kraft had: created, modified, accessed and printed the six electronic documents contemporaneously, as he actually performed the tasks. This CD was ordered by the Inland Parties' attorneys as part of discovery in the legal proceeding at the court and Rune Kraft swore under penalty of perjury that the facts contained on the CD were true. The CD did not reflect any of the "shenanigans" that the Inland Parties' attorneys would portray to the court 2.5 months after

COMPLAINT

64

they received it. In fact, Kraft had performed excellent work that was contemporaneously universally praised by everybody. Inland, Inc. had completed a transaction with Oldcastle above the agreed upon value of Inland, Inc. as determined by the Inland ESOP's independent valuation firm BCC Valuation Services, LLC. In order to prevent the plot from derailing and coming under the influence of disinterested judicial officers, as the legislature intended with the carefully calibrated statutory scheme policing legal proceedings in a court of the United States, under terms of the agreement between the Defendants and their conspirators, the six electronic documents were ordered to be forged. In order to show the forgeries to the court, the Defendants would examine the electronic documents in various stages of production and examine the projected status of its claims. Printouts of purported "statistics" were created subject to a set of stipulations between Inland, Inc. and the Inland ESOP After a few versions, these "statistics" showed the anomalies that would portray Rune Kraft as a forger, yet Inland, Inc. and, the Inland ESOP knew that Rune Kraft had provided them with electronic files that showed that Rune Kraft had created, modified, accessed and printed the six electronic documents contemporaneously, as he actually performed the tasks. Further, rather than be truthful and honest related to the electronic files obtained from Rune Kraft, Inland, Inc. and the Inland ESOP also agreed that the six forged electronic files should be given to "experts" for analysis to confirm the data that the Defendants had uncovered as part of their "investigation". In order to show the anomalies, the Defendants would cause "experts" to again examine the electronic files in various stages of production and examine the projected status of its claims. Written statements were again created subject to a set of stipulations between Inland, Inc. and the Inland ESOP. After a few versions, the written reports for the six electronic documents still showed the "statistics" that would portray Rune Kraft as a forger. The Defendants would use "experts" to show the anomalies if this aided and abetted the Defendants in validating their Fraudulent Scheme. Based on the electronic files received from the Defendants, "experts" agreed to issue "affirmative" written statements that these six electronic documents had been forged. The information regarding the six electronic documents that a particular written statement from an "expert" would show could be obfuscated and misrepresented by the Defendants per their agreement. The Defendants caused written statements accompanied by printouts of "statistics" signed under penalty of perjury to be used, despite knowing that the printouts of "statistics" were fabricated by the Defendants. The Defendants knew that categorizing

COMPLAINT

65

an electronic document as having been "Modified" 4 hours before it was "Created" would falsify, conceal or cover up the rights of the author who had contemporaneously done this as he actually performed the tasks. The Defendants knew that the six electronic documents were foundational evidence in the legal proceeding. The Defendants made or used false writing or documents knowing the same to contain materially false, fictitious, or fraudulent statement or entry. The Defendants knowingly or recklessly directed, participated in or aided and abetted in a material way, an activity which constitutes theft or fraud in connection with a legal proceeding in a court of the United States. The representations that Defendants and their conspirators would make or cause to be made touted the forgeries committed by Rune Kraft, when, in truth and in fact, those claims were false and designed to deceive the court and the public into believing that the Defendants "claims" were legitimate as falsely touted.

**False Statements Regarding the Nature of Relationship:**

b. The Defendants and their conspirators would make and cause to be made false and misleading representations concerning the hiring of Kraft related to the transaction between Inland, Inc., the Inland ESOP and Oldcastle. The Defendants portrayed to the court that they had hired Rune Kraft to be the broker and that Rune Kraft now had demanded to be paid for services rendered as a broker when this was false. Vicarea Real Estate, Inc., a California licensed real estate broker and the General Partner of Kraft Americas, L.P. offered to serve as a broker and presented a written agreement to Inland, Inc. as required by California law to serve as a broker, but Inland, Inc. never signed the written agreement and refused to hire Vicarea Real Estate, Inc. as the broker. Inland, Inc. also never offered to hire Rune Kraft and/or Kraft Americas, L.P. to serve as a broker. Inland, Inc., the Inland ESOP and Oldcastle also did not permit anybody to serve in the role of a broker as they elected to interact directly with each other and complete the transaction without the knowledge, presence, and participation of anybody but Inland, Inc., the Inland ESOP and Oldcastle. For example, Inland, Inc., the Inland ESOP and Oldcastle did not provide access to the documents, the people, and the process by anybody other than Inland, Inc., the Inland ESOP and Oldcastle. California law requires a party that serves in the capacity of a

COMPLAINT

66

broker to have access to the documents, the people, and the process, before a transaction takes place. Vicarea Real Estate, Inc. was informed by Inland, Inc. that the only way you get paid is to agree to commit fraud by making representations about a transaction and its compliance with applicable laws without access to documents, without access to people and with no control over the process - all after the closing of the transaction. The Defendants knew or should have known that it would be illegal for a real estate broker to sanction a transaction as a real estate broker without access to documents and information after its close and was deliberately trying to engage Vicarea Real Estate, Inc. in an illegal scheme to violate real estate laws. Inland, Inc. knew or should have known that this scheme was illegal and conspired to get Vicarea Real Estate, Inc. involved in the scheme. A real estate broker has fiduciary responsibilities to both sides in a transaction. These fiduciary responsibilities can only be fulfilled by having access to information before a transaction closes, by having access to documents before a transaction closes, by having access to people before a transaction closes and by controlling the transaction process before a transaction closes. It is impossible for a real estate broker to comply with real estate laws: if the sides are denying it access to documents and information prior to a transaction's close; if the sides are denying it access to people prior to a transaction's close; if the sides are failing to follow instructions; if the sides are denying it control of the transaction process prior to a transaction's close; and if one side is asking it to cover up environmental contamination. Since the discovery by Kraft of substantial environmental contamination at a plant location of Inland, Inc. that Inland, Inc. was aware of and had covered up and was trying to find a way to keep covered up, and the refusal by Kraft to cover it up, the recommendation of full disclosure and clean up, Inland, Inc. deliberately denied access to documents and information. Vicarea Real Estate, Inc. had a California real estate license and complied with statutory requirements by presenting a written agreement to serve as a broker. However, the written agreement was never accepted. Vicarea Real Estate, Inc. was prepared to serve as a broker but was never given the opportunity to serve as a broker, before the transaction closed.

**False Statements Regarding the Nature of Work:**

c. The Defendants and their conspirators would make and cause to be made false and misleading statements concerning the work performed by Kraft. The Defendants portrayed to the court that Kraft had served as a broker, which was false. Kraft provided research and analysis about construction materials markets, products and companies for Inland, Inc. A book account stated based upon an account in writing was sent to Inland, Inc. reflecting the work performed. This document was not for brokerage services but rather research and analysis done for Inland, Inc. about construction materials markets, products and companies as described in detail in the document.

**False Statements Regarding the "Broker Agreement":**

220. It was further a part of the conspiracy that the Defendants and others, would conceal from the court the laws governing transactions in California, and nature and character of their dealings, and would forestall the legal proceeding through various means, including, among others, the following interference with the due administration of justice:

a. In the State of California, a broker agreement must be in writing to avoid violating the statute of frauds, to ensure the agreement is enforceable and adequately describes the broker's assignment, and to disclose and obtain consent to the agency relationship(s) intended. See, *Business and Professions Code Sections 10176(a) and (d), Civil Code Sections 1624, 2079.13 et seq., 2295 et seq.,* among others. Also, See, *Phillippe v. Shapell Industries (1987) 43 Cal. 3d 1247, 1255-1258.*

b. Sworn testimony by the Defendants regarding their interaction with Kraft.

c. Denying Kraft due process by making him into a forger to make the court keep him in the dark while the Defendants went about their business of destruction of Kraft's book account stated based upon an account in writing to Inland, Inc.

d. The Defendants' deliberately withholding that they had entered into a contract that listed Rune Kraft as the broker in the transaction between Inland, Inc., the Inland ESOP and Oldcastle knowing that this was false.

COMPLAINT

68

e.  The Defendants concealing that Inland, Inc. before the transaction had closed had been offered an agreement in writing by Vicarea Real Estate, Inc. for Vicarea Real Estate, Inc. to act as the broker in the transaction between Inland, Inc., the Inland ESOP and Oldcastle and that Inland, Inc. refused to enter into the agreement.

f.  The Defendants hiding that the Defendants after the transaction had closed had tried to hire Vicarea Real Estate, Inc. to be the broker in the transaction and offered to pay Vicarea Real Estate, Inc. a specific amount for acting as a broker.

g.  The Defendants agreeing to cover up that Inland, Inc. had been presented with a book account stated based upon an account in writing, falsifying, concealing or covering up that the document was issued to only Inland, Inc. and was for research and analysis about construction materials markets, products and companies (not broker services).

h.  The Defendants agreeing that the functions of government's administration of justice would be frustrated to enable the destruction of the book account stated based upon an account in writing to Inland, Inc. and to cover up that in the sale of Inland, Inc. to Oldcastle, Inland, Inc., the ESOP and Oldcastle elected to deal directly with each other without using the services of any brokers, despite what the contract that they entered into listed.

221. The CRH Parties could have caused the book account stated based upon an account in writing to Inland, Inc. to be paid, but elected to embrace that species of fraud which did, or attempted to, defile the court itself, or was a fraud perpetrated by officers of the court so that the judicial machinery could not perform in the usual manner its impartial task of adjudging cases that were presented for adjudication.

**OVERT ACTS**

222. In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Central District of California and elsewhere, at least one of the following overt acts, among others:

COMPLAINT

69

223. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Inland Fee Agreement - May 13, 2007 - Draft.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about *3.5* years after it was last "Modified" and "Printed" by Rune Kraft.

224. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Inland Fee Agreement - May 13, 2007.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about *3.5* years after it was last "Modified" and "Printed" by Rune Kraft.

225. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Letter to Inland - August 2, 2007.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.2 years after it was last "Modified" and "Printed" by Rune Kraft.

226. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Letter to Inland - May 17, 2007.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about *3.5* years after it was last "Modified" and "Printed" by Rune Kraft.

227. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Letter to Inland - May 31, 2007.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about *3.5* years after it was last "Modified" and "Printed" by Rune Kraft.

228. On or about January 31, 2011 the CRH Parties created or caused to be created a print-out of "statistics" of a Microsoft Word file titled "Inland Fee Agreement - July 31, 2007.doc". The electronic document was forged to falsely portray as having been "Modified" 4 hours before it was "Created" by Rune Kraft and "Accessed" about 3.2 years after it was last "Modified" and "Printed" by Rune Kraft.

COMPLAINT

70

229. On or about January 31, 2011, the CRH Parties caused a written statement to be prepared describing how their investigation had uncovered that the six electronic documents (described in the six preceding paragraphs) were "Modified" 4 hours before they were "Created".

230. On or about January 31, 2011 the CRH Parties caused the written statement to be signed under penalty of perjury.

231. On or about January 31, 2011 the CRH Parties caused the false written statement accompanied by the six forged print-out of "statistics" to be sent by the wire to the court.

80. On or about January 31, 2011 the CRH Parties caused the false written statement accompanied by the six forged print-out of "statistics" to be sent by the mail to various parties, including parties in the legal proceeding and their representatives.

232. On or about February 15, 2011 the CRH Parties provided false information to witness as to evidence received from Rune Kraft related to six electronic documents - specifically the metadata of the six electronic documents as described in detail above.

233. On or about February 15, 2011 the CRH Parties provided false information to witness as to broker relationship and purported terms and conditions.

234. On or about January 7, 2015 the CRH Parties caused a wire transmission of a void judgment to be sent from Washington to attorneys in Arizona for the purpose of paying the dummy judgment to Oldcastle Precast.

235. On or about April 1, 2015 the CRH Parties caused a wire transmission of a void judgment to be sent from Washington to attorneys in Colorado for the purpose of paying the dummy judgment to Oldcastle Precast.

236. On or about June 16, 2015 the CRH Parties caused a wire transmission of a void judgment to be sent from Washington to attorneys in New Mexico for the purpose of paying the dummy judgment to Oldcastle Precast.

237. The acts alleged in Predicate Acts Two through Forty-Six of the Complaint are realleged and incorporated herein as additional overt acts in furtherance of the conspiracy and to achieve the objects and purpose thereof.

All in violation of Title 18, United States Code, Section 1962(d).

COMPLAINT

71

# 18. Mail Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1341)

238. Paragraphs 1 through 237 of this complaint are re-alleged and incorporated by reference as though fully set forth herein.

239. From in or about at least January 2011, through present, in the Central District of California and elsewhere, the Defendants aided and abetted by each other and others, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

240. It was a purpose of the scheme and artifice that the Defendants and their co-schemers would solicit and obtain claims against Plaintiff's business or property through false pretenses and representations, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## SCHEME AND ARTIFICE

241. Paragraphs 217 through 221 of the conspiracy to commit mail fraud, wire fraud and obstruction of justice are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

## USE OF THE MAILS

242. On or about the dates specified as to each count below, the Defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly deposited and caused to be deposited the matters and things listed below, and caused the matters and things to be sent and delivered, by private and commercial interstate carrier and by the United States Postal Service:

COMPLAINT

72

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF MAIL FRAUD 18 U.S.C. § 1341 |
|---|---|---|
| 1 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to the U.S. District Court for the Central District of California in Los Angeles, California |
| 2 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to Inland, Inc. in Riverside, California |
| 3 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to Inland, Inc. in Henderson, Nevada |
| 4 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to Oldcastle Precast, Inc. in Fontana, California |
| 5 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to the CRH Defendants' attorneys in Palo Alto, California |
| 6 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered |

COMPLAINT

73

| | | |
|---|---|---|
| | | to Oldcastle Precast, Inc. in Auburn, Washington |
| 7 | 31-Jan-11 | Mail matter containing a written statement signed under penalty of perjury accompanied by purported print outs of "statistics" sent and delivered via United States Postal Service from the CRH Defendants' attorneys in Los Angeles, California, and delivered to the Inland ESOP's attorneys in Santa Monica, CA |
| 8 | 1-Sep-15 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from Waycor Materials, Inc. in Utah to Oldcastle Precast, Inc. in Washington |
| 9 | 1-Sep-15 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 10 | 1-Oct-15 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 11 | 1-Nov-15 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 12 | 1-Dec-15 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 13 | 1-Jan-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 14 | 1-Feb-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 15 | 1-Mar-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |

COMPLAINT

74

| 16 | 1-Apr-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 17 | 1-May-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 18 | 1-Jun-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 19 | 1-Jul-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 20 | 1-Aug-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 21 | 1-Sep-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 22 | 1-Oct-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 23 | 10-Nov-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 24 | 1-Dec-16 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |
| 25 | 1-Jan-17 | Mail matter containing a payment of the dummy judgment to Oldcastle Precast, Inc. sent from CalMat Co. dba Vulcan Materials Company in Alabama to Oldcastle Precast, Inc. in Washington |

COMPLAINT

75